**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**HARTFORD DIVISION**

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| CLINTON NURSERIES, INC., | : | Case No. 17-31897(JTT) |
| CLINTON NURSERIES OF MARYLAND, INC., | : | Case No. 17-31898(JTT) |
| CLINTON NURSERIES OF FLORIDA, INC., and | : | Case No. 17-31899(JTT) |
| TRIEM LLC, | : | Case No. 17-31900(JTT) |
| | : | (Jointly Administered Under |
| Debtors. | : | Case No. 17-31897(JTT)) |
| VARILEASE FINANCE, INC., | : | |
| | : | |
| Movant, | : | |
| | : | |
| v. | : | |
| | : | |
| CLINTON NURSERIES, INC., | : | |
| CLINTON NURSERIES OF MARYLAND, INC., | : | |
| CLINTON NURSERIES OF FLORIDA, INC., and | : | |
| TRIEM LLC, | : | |
| | : | |
| Respondents. | : | |
| | : | |

**DEBTORS' OBJECTION TO VARILEASE FINANCE, INC.'S**
**MOTION TO COMPEL COMPLIANCE WITH 11 U.S.C. § 365(D)(5)**

Clinton Nurseries, Inc., Clinton Nurseries of Maryland, Inc., Clinton Nurseries of Florida, Inc., and Triem LLC (the "Debtors"), for their objection to the Motion of Varilease Finance, Inc. ("VFI") To Compel Compliance With 11 U.S.C. § 365(d)(5) (ECF Doc. No. 328, the "Motion to Compel"), respectfully state:

**BACKGROUND:**

1. On December 18, 2017 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (such title, hereinafter, the "Bankruptcy Code"). Pursuant to Bankruptcy Code §§ 1107(a) and 1108, the Debtors continue to

1

operate their businesses and manage their properties, affairs, and assets as debtors-in-possession. On December 22, 2017, the Court entered an order directing that the Debtors' cases be jointly administered. No trustee or examiner has been appointed in these cases.

2. CNI is a Connecticut corporation that owns and operates a wholesale plant nursery, growing trees, flowering shrubs, roses, ornamental grasses and ground covers. CNI operates on land located in Westbrook, Connecticut, a portion of which is owned by an affiliate of CNI. As of the Petition Date, CNI employed approximately eighty-four people.

3. CMI is a Connecticut corporation that is wholly owned by CNI. CMI owns and operates a wholesale plant nursery, growing trees, flowering shrubs, roses, ornamental grasses and ground covers, on land located in Centreville, Maryland, and other locations in Maryland, a portion of which is owned by Triem LLC and a portion of which is owned by an affiliate of CNI. As of the Petition Date, CMI employed approximately fifty-two people.

4. CFI is a Florida corporation that is wholly owned by CNI. CFI owns and operates a wholesale plant nursery, growing trees, flowering shrubs, roses, ornamental grasses and ground covers, on land it owns located in Havana, Florida. CFI has access to an additional land located in Quincy, Florida. As of the Petition Date, CFI employed approximately eighty-six people.

5. Triem LLC is Connecticut limited liability company that is an affiliate of CNI. Triem owns a house located in Westbrook, Connecticut, and the land located in Centreville, Maryland on which CMI operates its business. Triem also filed a petition under Chapter 11 of the Bankruptcy Code on December 18, 2017, and its case is being jointly administered with the cases of the Debtors.

6. The Debtors' combined revenue has been in the range of $45 million for the past several years. The Debtors historically have sold their products to a relatively small number of

very large retail seller customers, and at this point the Debtors have two such very large customers. The Debtors are one of a small handful of vendors with the production capacity to serve the majority of the East Coast for these large customers. The quantity of the Debtors' inventory reflects grow times (in some cases years) necessary to fulfill order requests across the spectrum of grow times for one "trade" gallon pots to twenty-five "trade" gallon pots. All inventory is potted to meet customers' requirements of no "bound and bagged" plants.

7. The Debtors enjoyed profitable operations for the majority of the ninety-six years they or their predecessors have been in business. Several years ago, one large former customer instituted a new business model that resulted in dramatically eroding margins for suppliers such as the Debtors. At the same time, the Debtors were in the midst of an expansion effort and had invested substantial capital in growing inventory to support its large customers at the time. While as of the Petition Date the Debtors' operations were profitable, the Debtors' expansion followed by the decline in business with and eventual loss of the former customer left the Debtors overleveraged.

## **THE DISGUISED FINANCING TRANSACTIONS:**

8. On July 16, 2015, VFI, as lessor, and CNI and CNM, as co-lessees, entered into a master lease agreement (the "Master Lease"), whereby VFI "leased" to CNI and CNM certain personal property to be described in schedules to be incorporated into the Master Lease. On July 16, 2015, CNF executed a guaranty of CNI's and CNM's obligations under the Master Lease. Under section 2(b) of the Master Lease, CNI and CNM granted VFI a security interest in "any and all goods, chattels, fixtures, equipment, assets, accounts receivable, contract rights, general intangibles and property of every kind wherever located in which [CNI and CNM] has any interest and proceeds thereof, and agrees that any security interest created by the Master Agreement

secures any and all obligations of [CNI and CNM] and those of any affiliate of [CNI and CNM] to [VFI] whether now in existence and/or to come into existence." VFI filed a UCC-1 financing statement with the relevant Connecticut and Maryland filing offices on or about September 28, 2015.

9. On July 16, 2015, CNI, CNM and VFI entered into Schedule No. 1 to the Master Lease. Section 1 of Schedule No. 1 provides that the equipment to be leased consists of "IT equipment, cabling, software, irrigation equipment, pond liner and related equipment as approved by Lessor together with all other equipment and property hereafter purchased pursuant to the terms of the Lease, and any and all additions, enhancements and replacements thereto. . . . The Equipment shall be more fully and completely described in an Installation Certificate, which shall later be executed by Lessee in connection with the Schedule." The Installation Certificate[1] executed in connection with Schedule No. 1 details that approximately forty percent of the amount loaned pursuant to Schedule No. 1 was loaned to finance the installation of a holding pond at one of CNM's locations in Maryland. The items "leased" included stone, crushed and mixed concrete, and galvanized and steel pipe used to construct the holding pond, short-term rental of heavy equipment such as bulldozers used in the construction work, freight for the delivery of the material used to construct the holding pond, and fees for services such as engineering and surveying. The balance of the equipment "leased" consists of the installation of a computer software system. Again, a very large portion of these items consist of services provided rather than hardware or software installed. The original total equipment costs under Schedule No. 1 was $2,075,000.00, the Base Term of the lease was thirty-six months, and the base monthly rent was $68,890.00 plus

---

[1] The Installation Certificates are voluminous and will be offered into evidence at any evidentiary hearing on the Motion to Compel.

4

applicable sales and use tax. Schedule No. 1 was subsequently amended twice, such that the total equipment cost is $2,288,103.66 and the Base Monthly Rental is $75,965.04.

10. On July 21, 2016, VFI and CNI and CNM entered into Schedule No. 2 to the Master Lease. The bulk of the equipment "leased" under Schedule No. 2 consists of the installation of a computer software system. Again, a very large percentage of the amount related to the computer software system consists of services provided rather than hardware or software installed. The original total equipment costs under Schedule No. 2 was $1,000,000.00, the Base Term of the lease was thirty-six months, and the base monthly rent was $33,2000.00 plus applicable sales and use tax.

12. Among other provisions relevant to the true lease vs security analysis are the following. [2] Section 3(b) provides in part: "SUBJECT TO THE PROVISIONS OF SECTION 19(b), THIS IS A NON-CANCELABLE, NON-TERMINABLE LEASE OF EQUIPMENT FOR THE ENTIRE LEASE TERM AS PROVIDED IN EACH SCHEDULE HERETO." Section 10e of Schedule No. 1 and Schedule No. 2 provides: "For purposes of this Schedule only, provided no

---

[2] While VFI may cite Section 8(b) of the Master Lease, which states that the Master Lease is a true lease, as support for its argument, such contractual language has been widely held to be non-determinative and largely irrelevant in the face of Section 1-203. PSINet, Inc. v. Cisco Sys. Capital Corp. (In re PSINet, Inc.), 271 B.R. 1, 44 (S.D.N.Y. 2001) ("The intent of the parties at the time the agreement was entered into is irrelevant to the determination of whether a true lease has been established. The statute [Section 1-203] sets forth a test, which looks to the underlying substance of the transaction. If both parts of the statutory test are met, then, as a matter of law, the transaction is really a sale which created a security interest"); see also In re Action Transit, Inc., 2008 Bankr. LEXIS 513, *14, 49 Bankr. Ct. Dec. 120 (E.D. Wis. 2008) ("The parties may not change the legal effect of the document by giving it a different name"); In re Grubbs Constr. Co., 319 B.R. 698, 714 (M.D. Fla. 2005) ("In determining whether a lease is a true lease, the form or title chosen by the parties is not determinative"); In re Zerkle Trucking Co., 132 B.R. 316, 319-320 (S.D.W. Va. 1991) ("Terminology and labels used in self-proclaimed lease agreements are not determinative of the true nature of the agreement. The Court assigns little weight to the fact that the agreements under consideration are entitled equipment lease agreements and that the parties are identified as lessor and lessee"). The Court should give the language contained in Section 8(b) of the Agreement little weight, if any at all.

5

Event of Default has occurred and is continuing, or an event which with the giving of notice or lapse of time, or both, would constitute an Event of Default, Section 19(b)(i) of the Master Agreement shall be deleted in its entirety and replaced with the following: 'purchase all, but not less than all, of the Items of Equipment for one dollar ($1.00).'"

13. Prior to the Petition Date, the Debtors had paid VFI approximately $1.7 million.

14. On April 13, 2018, VFI filed the Motion to Compel, seeking an order compelling the Debtors' to make payments under the Master Lease. VFI argues that the Master Lease is a "true lease," entitling VFI to payments under Code section 365(d)(5). The Debtors object to the Motion to Compel on the ground that the Master Lease is in fact disguised financing.

**LAW AND DISCUSSION:**

15. Bankruptcy Code section 365(d)(5) provides in relevant part: "The trustee shall timely perform all of the obligations of the debtor, except those specified in section 365(b)(2), first arising from or after 60 days after the order for relief in a case under chapter 11 of this title under an unexpired lease of personal property (other than personal property leased to an individual primarily for personal, family, or household purposes), until such lease is assumed or rejected notwithstanding section 503(b)(1) of this title, unless the court, after notice and a hearing and based on the equities of the case, orders otherwise with respect to the obligations or timely performance thereof." It is well established that Code section 365(d)(5) only applies to what has been characterized as a "true lease." Wells-Fargo Equip. Fin. v. Circuit-Wise (in Re Circuit-Wise, Inc.), 277 B.R. 460, 462 (D. Conn. 2002). Thus, it is "necessary, as a prerequisite to determining whether an equipment lessor has rights under section 365 … to determine *first* whether the agreement denominated as a lease is indeed a true lease." Circuit-Wise, 277 B.R. at 464 (emphasis in original).

16. "Although the Bankruptcy Code contemplates the differences between true leases and secured transactions and the respective rights of the parties that flow from each, state law controls the classification of a contractual agreement as between the two." Fangio v. Vehifax Corp. (In re Ajax Integrated, LLC), 554 B.R. 568, 577-578 (N.D.N.Y 2016), *citing* Powers v. Royce, Inc. (In re Powers), 983 F.2d 88, 90 (7th Cir.1993) ("[a]s courts have consistently recognized, whether a lease constitutes a security interest under the bankruptcy code will depend on whether it constitutes a security interest under applicable state law."). See also Rentrak v. Ladieu (In re Ladieu), 2011 Bankr. LEXIS 721, [*27] (Bankr. D. Vt. 2011) ("State law determines whether an agreement constitutes a true lease or a security agreement."); WorldCom, Inc. v. GE Global Asset Mgmt. Servs. (In re Worldcom, Inc.), 339 B.R. 56, 63 (Bankr. S.D.N.Y. 2006).

17. The provision of the Uniform Commercial Code that governs the true lease vs security analysis, section 1-203(a),[3] provides: "Whether a transaction in the form of a lease creates a lease or security interest is determined by the facts of each case." Fundamentally, "a lease involves payment for the temporary possession, use and enjoyment of goods, with the expectation that the goods will be returned to the owner with some expected residual interest of value remaining at the end of the lease term. In contrast, . . . a security interest is only an inchoate interest contingent on default and limited to the remaining secured debt." In re WorldCom, Inc., 339 B.R. at 64 (quoting James J. White & Robert S. Summers, Uniform Commercial Code vol. 4, sec. 30-3, 14 n.18 (5th ed. West 2002)). Critically, "[c]ourts have held that the practical inability of the lessee to return the leased goods due to the cost and difficulty of removal is evidence that a

---

[3] Section 19 of the Master Lease provides that Michigan law governs. The Debtors do not concede that the law of Michigan governs, but because the applicable statutory language in Connecticut and Michigan is identical, the choice of law analysis does not change the outcome. In re Ladieu, 2011 Bankr. LEXIS 721, [*27] ("[A]s the UCC is a uniform law, the Court may consider decisions from other state and federal courts."); In re WorldCom, Inc., 339 B.R. at 63-64 ("As the UCC is intended as a uniform law, the Court will consider decisions from other states and federal courts interpreting § 1-201(37).")

security interest was created." Id. at 74. The Debtors will discuss below the tests that both the Uniform Commercial Code and courts have created to distinguish leases from security interests, but it is important to keep in mind when going through that analysis the nature of the property at issue here—as described above, a substantial portion of the amounts obtained from VFI by CNI and CNM was used to construct a holding pond in Maryland. It would be completely impractical for CNI and CNM to tear up that holding pond, which includes rock and concrete and underground pipes, and give back what essentially would be scrap to VFI. The cost of doing so would be prohibitive, and the benefit to VFI minimal. Both the Debtors and VFI would have been fully aware of this at the time the Master Lease was entered into. The argument that the personal property used to construct the holding pond was to be for the Debtors' "temporary possession, use and enjoyment . . . with the expectation that the goods [would] be returned to [VFI] with some expected residual interest of value at the end of the lease term" is simply not supportable.

18. The analysis under UCC section 1-203 proceeds in two steps—the first step is the "bright line test" and, if the agreement appears to be a lease under that test, courts proceed to a second step, the "economics of the transaction test" or "the facts of each case" test. Id. at 64-65.

19. "The Bright-Line Test requires the Court to determine whether the contractual terms of the Agreement, either on their face or as applied, bear certain characteristics the statute defines as conclusive evidence that a security interest was created." Id. at 65. With respect to the Bright-Line Test, UCC section 1-203(b) provides:

> A transaction in the form of a lease creates a security interest if the consideration that the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease and is not subject to termination by the lessee, and: (1) the original term of the lease is equal to or greater than the remaining economic life of the goods; (2) the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods; (3) the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or

8

> for nominal additional consideration upon compliance with the lease agreement; or (4) the lessee has an option to become the owner of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement.

20. There can be no dispute that pursuant to the terms of the Master Lease, the Debtors were to pay VFI for the entire term of the Master Lease. Indeed, VFI depends on the Debtors' claimed noncompliance with this obligation to assert a right to recover the Stipulated Loss Value (as defined in the Master Lease) of the goods and services contemplated by the Master Lease.

21. The second element of UCC section 1-203(b) is also met. Nowhere in the Master Lease is there language granting the Debtors the option of terminating their obligations under the Master Lease. On the contrary, pursuant to Section 3(b) quoted above, the agreement is "non-cancelable" and "non-terminable" outside of very limited *end-of-term* options outlined in Section 19(b), none of which give the Debtors an opportunity to terminate the Master Lease early.

22. Finally, the third element of UCC section 1-203(b) is met. While the underlying Master Lease does not provide to the Debtors an option to become owners of the relevant personal property, *see* Section 19(b), Section 10e of each of the operative Schedules quoted above provides for a $1.00 purchase option under certain conditions. It is well settled that $1.00 is "nominal consideration." *See* PSINet, Inc. v. Cisco Sys. Capital Corp. (In re PSINet, Inc.), 271 B.R. 1, 45 (S.D.N.Y. 2001) ("It is well established that an option price of a dollar is nominal within the meaning of [the UCC] and where such an amount is agreed to, there is no need to delve into an analysis of the economic sensibility of purchasing the equipment for that price"); In re Macklin, 236 B.R. 403, 407 (E.D. Ark. 1999); Hunter v. Snap-On Credit Corp. (In re Fox), 229 B.R. 160, 165 (N.D. Ohio 1998); All American Mfg. Corp. v. Quality Textile Screen Prints (In re All American Mfg. Corp.), 172 B.R. 394, 398 (S.D. Fla. 1994). Thus, because the Debtors had the

option to purchase under the Master Lease for the "nominal additional consideration" of $1.00, the third element of section 1-203(b) is satisfied.

23. VFI argues that the purchase option never came into being because the Debtors defaulted under the Master Lease. VFI contends without support that "[c]haracterization of the Master Lease as a lease versus a security interest must necessarily be analyzed by its terms at the time this Court is called upon to interpret it, not at the time of its execution or at some other prior hypothetical point in time." Brief In Support Of Motion Of Varilease Finance, Inc. To Compel Debtors' Compliance With 11 U.S.C. § 365(D)(5), at 5. However, cases in this Circuit support the conclusion that the date of the transaction, rather than a future date, is the appropriate point in time to determine the parties' rights. See In re WorldCom, Inc., 339 B.R. at 67 ("'When the parties sign the contract and become bound, they have either made a lease or a security agreement. That agreement is based upon their present judgments about values, useful life, inflation, risk of non-payment, and other matters. Foresight not hindsight controls.'") (quoting White & Summers, § 30-3 at 9)). That compliance with the Master Lease is a condition to the right to exercise the option to purchase does not mean that the option only exists if there is no default. Indeed, UCC section 1-203(b)(4) expressly provides that the "lessee has an option . . . *upon compliance with the lease agreement*.").

24. Because the elements of UCC section 1-203(b) are met, the Master Lease is not a true lease but rather a disguised financing instrument that creates a security interest.

25. Even assuming the Master Lease were found not to be for the creation of security under the Bright-Line Test, the result would not change. If a transaction appears to be a true lease under the Bright-Line Test, courts then look to the "Economics of the Transaction" or "Facts of the Case" Test. Under that test, the court examines "the specific facts of the case to determine

whether the economics of the transaction suggest that the arrangement is a lease or a security interest." In re Purdy, 763 F.3d 513, 519 (6th Cir. 2014).

> At common law, the central feature of a true lease is the reservation of an economically meaningful interest to the lessor at the end of the lease term. Ordinarily this means two things: (1) at the outset of the lease the parties expect the goods to retain some significant residual value at the end of the lease term; and (2) the lessor retains some entrepreneurial stake (either the possibility of gain or the risk of loss) in the value of the goods at the end of the lease term.

In re WorldCom, Inc., 339 B.R. at 71 (citation omitted). "The precise contours of the economics-of-the-transaction test are rather unclear, but courts have largely focused upon two particular factors: (1) whether the lease transaction contains a purchase option price that is nominal; and (2) whether the lessee develops equity in the property, such that the only economically reasonable option for the lessee is to purchase the goods." In re Purdy, 763 F.3d at 520. "The ultimate question . . . however, is whether [the lessor] kept a meaningful reversionary interest in [the goods]." Id. at 519.

26.    The nominal purchase option is discussed above. In addition, here there is no question that VFI did not retain a meaningful reversionary interest in the personal property at issue. As discussed above, the personal property used in the construction of the holding pond cannot feasibly be returned to VFI. While some portion of the software system may be returnable, the Debtors believe that the value of whatever could be returned would be *de minimis* relative to its cost. Obviously, the services provided in connection with the construction of the holding pond and the installation of the software system have no reversionary value. The Debtors are the only parties that the personal property at issue has any value to. Given the nature of the property, there could have been no expectation at the outset of the Master Lease that the personal property at issue would retain some significant residual value *for VFI* at the end of the lease term.

11

WHEREFORE, for the foregoing reasons, the Debtors request that the Court deny VFI's Motion to Compel and grant the Debtors such other and further relief as the Court deems just and proper.

Dated this 25th day of April, 2018, at Bridgeport, Connecticut.

THE DEBTORS,

*/s/ Christopher H. Blau*
Eric Henzy (Federal Bar No. ct12849)
Christopher H. Blau (Federal Bar No. ct30120)
ZEISLER & ZEISLER, P.C.
10 Middle Street, 15th Floor
Bridgeport, CT  06605
Tel. 203-368-4234
Fax 203-367-9678
Email:  ehenzy@zeislaw.com
cblau@zeislaw.com
Their Attorneys