**UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
HARTFORD DIVISION**

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| CLINTON NURSERIES, INC., | : | Case No. 17-31897(JTT) |
| CLINTON NURSERIES OF MARYLAND, INC., | : | Case No. 17-31898(JTT) |
| CLINTON NURSERIES OF FLORIDA, INC., and | : | Case No. 17-31899(JTT) |
| TRIEM LLC, | : | Case No. 17-31900(JTT) |
| | : | (Jointly Administered Under |
| Debtors. | : | Case No. 17-31897(JTT)) |

**DEBTORS' SUR-REPLY TO VARILEASE FINANCE, INC.'S REPLY TO DEBTORS' OBJECTION TO VARILEASE FINANCE, INC.'S MOTION TO COMPEL COMPLIANCE WITH 11 U.S.C. § 365(D)(5)**

Clinton Nurseries, Inc. ("CNI"), Clinton Nurseries of Maryland, Inc. ("CNM"), and Clinton Nurseries of Florida, Inc. ("CNF"; together with CNI and CNM, the "Debtors"), submit this sur-reply in response to the Reply Of Varilease Finance, Inc. ("VFI") To The Debtors' Objection To Varilease Finance, Inc.'s Motion To Compel Compliance With 11 U.S.C. § 365(D)(5) (ECF Doc. No. 358, the "Reply"). This sur-reply is limited to the issue of whether there was an effective nominal purchase option in the Agreements (as defined below), so that the Agreements constitute security agreements rather than true leases.[1] As is made clear in the Reply

---

[1] This sur-reply is limited to the nominal consideration portion of the so-called "Bright Line" test, i.e., UCC 1-203(b)(4), for determining whether an agreement is a true lease or a security agreement. VFI appears not to dispute that the other components of the Bright Line test are met, and it is made clear in the Master Agreement that the Master Agreement and Agreements are not subject to termination by the Debtors. Master Agreement § 3(b) ("SUBJECT TO THE PROVISIONS OF SECTION 19(b), THIS IS A NON-CANCELABLE, NON-TERMINABLE LEASE OF EQUIPMENT FOR THE ENTIRE LEASE TERM AS PROVIDED IN EACH SCHEDULE HERETO."). Further, as made clear in the Debtors' Objection, even assuming that the Bright Line test is not met, the Debtors believe that the Agreements would be determined to be security agreements under the "Economics of the Transaction" or "Facts of the Case" Test. As stated in the Debtors' Objection, under this latter test "[t]he ultimate question . . . is whether [the lessor] kept a meaningful reversionary interest in [the goods]." In re Purdy, 763 F.3d 513, 519 (6th Cir. 2014). As discussed in the Debtors' Objection, much of what was borrowed from VFI was used by the Debtors to construct a holding pond and a loading dock that cannot feasibly be returned to VFI. While some portion of other of the property purchased using funds borrowed from VFI, consisting of a software system, might in theory be returnable, the Debtors believe that the value of whatever could be returned would be *de*

1

and in its Brief In Support Of Motion Of Varilease Finance, Inc. To Compel Debtor's Compliance With 11 U.S.C. § 365(D)(5) (ECF Doc. No. 349, the "VFI Brief"), VFI's position that it is entitled to post-petition payments pursuant to Bankruptcy Code section 365(d)(5) depends on the argument that the $1.00 purchase option contained in the Agreements never became effective and that it is the Master Agreement (as defined below), rather than the Agreements, that is the operative agreement for the purposes of the true lease vs security agreement analysis. As discussed in this sur-reply, VFI is wrong both factually and as a matter of law—the Agreements are the relevant agreements for the purposes of the Bankruptcy Code section 365(d)(5) determination and the $1.00 purchase option did become effective upon the execution of the Agreements.

**Background**

As described in the Debtors' Objection, on July 16, 2015, VFI and CNI and CNM entered into an agreement titled "Master Lease Agreement" (the "Master Agreement"). Section 1 of the Master Agreement provides in relevant part:

> On the terms and conditions of this Master Agreement, Lessor shall lease to Lessee, and Lessee shall hire from Lessor, the items of personal property described in the Schedule(s) (collectively the "Equipment", and individually an "Item") which shall incorporate this Master Agreement. Subject to Section 16(a)(viii), *each Schedule shall constitute a separate and independent lease and contractual obligation of Lessee.* The term "Lease" shall refer to an individual Schedule that incorporates this Master Agreement. *In the event of any conflict between this Master Agreement and any Schedule, the language of the Schedule shall prevail.*

(Emphasis added). Section 19(b) of the Master Agreement provides in relevant part:

> Provided no Event of Default has occurred and is continuing, and provided no Event of Default or event which with the giving of notice or lapse of time, or both, would constitute an Event of Default has occurred and is continuing, upon the completion of the Base Term of any Schedule, Lessee shall, upon giving one hundred eighty (180) days prior written

---

*minimis* relative to its cost. The Debtors are the only parties that the property at issue has any value to. Given the nature of the property obtained with the funds borrowed from VFI, there could have been no expectation at the time the property was obtained pursuant to the Agreements that the personal property at issue would retain some significant residual value *for VFI* at the end of the term. The Debtors reserve all rights to make arguments under the Economics of the Transaction test.

> notice to Lessor by certified mail, elect one of the following options: (i) purchase all, but not less than all, of the Items of Equipment on the applicable Schedule for a price to be agreed upon by both Lessor and any applicable Assignee and Lessee . . . .

On July 16, 2015, CNF executed a guaranty of CNI's and CNM's obligations under the Master Agreement.

On July 16, 2015, CNI, CNM and VFI entered into Schedule No. 1 ("Agreement No. 1"). On July 21, 2016, VFI and CNI and CNM entered into Schedule No. 2 ("Agreement No. 2"; together with Agreement No. 1, the "Agreements"; the Master Agreement and the Agreements are annexed to the Motion To Compel, as defined below, as Exhibit A). The first paragraph of each of the Agreements provides in relevant part that it "*incorporates by reference the terms and conditions of the Master Lease Agreement dated July 16, 2015 between Lessor and Lessee (the 'Master Agreement') and constitutes a separate lease between Lessor and Lessee.* The Schedule and Master Agreement are hereinafter referred to collectively, as the 'Lease'" (emphasis added). Section 10e of the Agreements provides:

> For purposes of this Schedule only, *provided no Event of Default has occurred and is continuing*, or an event which with the giving of notice or lapse of time, or both, would constitute an Event of Default, Section 19(b)(i) of the Master Agreement shall be deleted in its entirety and replaced with the following: "purchase all, but not less than all, of the Items of Equipment for one dollar ($1.00)." All other terms and conditions of the Master Agreement shall remain in full force and effect without change.

(Emphasis added).

On April 13, 2018, VFI filed its Motion Of Varilease Finance, Inc. To Compel Debtors' Compliance With 11 U.S.C. § 365(D)(5) (ECF Doc. No. 328, the "Motion To Compel"). On April 24, 2018, the Official Committee of Unsecured Creditors filed its Objection To Motion Of Varilease Finance, Inc. To Compel Debtors' Compliance With 11 U.S.C. § 365(D)(5) (ECF Doc. No. 348, the "Committee Objection). On April 25, 2018, VFI filed the VFI Brief in response to the Committee Objection. Also on April 25, 2018, the Debtors filed their Objection To Varilease

Finance Inc.'s Motion To Compel Compliance With 11 U.S.C. § 365(D)(5) (ECF Doc. No. 352, the "Debtors' Objection").

On April 26, 2018, the Court held a hearing on the Motion To Compel. At that hearing, VFI, the Debtors, and the Committee agreed that the Court could first consider the nominal consideration portion of the "Bright Line" test under UCC 1-203(b) before turning to, if necessary, issues beyond the Bright Line test that may require the presentation of evidence. VFI filed the VFI Reply on May 1, 2018.

### ARGUMENT

VFI's argument is that Section 10e of the Agreements provide for an amendment to the Master Agreement that would become effective only if there was no Event of Default (as defined in the Master Agreement) at any time during the Base Term, that there were Events of Default during the Base Term so that the amendment to the Master Agreement to include a $1.00 buy-out option never occurred, and that the Master Agreement never included an enforceable $1.00 buy-out term. "There being no contractual dollar buy-out ever added to the Master Lease, the Master Lease is a true lease." VFI Brief at 2.

Whether or not the Master Agreement is a true lease is not the issue, as the Agreements are the agreements pursuant to which the Debtors borrowed money from VFI and which the Court must determine to be leases or security agreements. As is made clear in Section 1 of the Master Agreement and the first paragraph of each of the Agreements, the Agreements constitute separate and independent agreements. The terms and conditions of the Master Agreement are incorporated into the Agreements, not the other way around. It is the Agreements pursuant to which the Debtors borrowed money from VFI, not the Master Agreement. The Agreements provide for, among other

things, price and payment terms and the property obtained with the funds borrowed, not the Master Agreement.

The plain language of Section 10e of the Agreements provides that the purchase option shall be for $1.00, i.e., a nominal amount. The issue here is what the "provided no Event of Default has occurred and is continuing" language in Section 10e of the Agreements emphasized above is referring to, i.e., whether that language is referring to a pre-requisite to the *existence* of an option to purchase for a nominal amount or the *ability to exercise* an existing option to purchase for a nominal amount. This is where VFI's argument fails—VFI appears to argue that the Section 10e nominal purchase option did not exist at the inception of the Agreements, so that the Agreements were leases at inception, but could have existed at some point in the future, so that the Agreements could prospectively have transformed into security agreements.

The law is very clear that whether an agreement constitutes a true lease or a security agreement is determined as of the time the agreement is entered into, here at the time the Agreements were entered into. An agreement is either a lease or a security agreement when signed, there is no later "transubstantiation." E.g., Terlecky v. People's Capital & Leasing Corp. (In re Amerigraph LLC), 2012 Bankr. LEXIS 5071, [*33] (Bankr. S.D. Ohio 2012) ("When the parties sign the contract and become bound, they have either made a lease or a security agreement."); Rentrak Corp. v. Ladieu (In re Ladieu), 2011 Bankr. LEXIS 721, [*39] (Bankr. D. Vt. 2011); Park Western Fin. Corp. v. Phoenix Equip. Co. (In re Phoenix Equip. Co.), 2009 Bankr. LEXIS 3123, [*21] (Bankr. D. Ariz. 2009); In re Gateway Ethanol, L.L.C., 415 B.R. 486, 500 (Bankr. D. Kan. 2009) ("[S]omething is a security agreement or lease when it is signed." (citation omitted)); WorldCom, Inc. v. GE Global Asset Mgmt. Servs. (In re WorldCom, Inc.), 339 B.R. 56, 67 (Bankr. S.D.N.Y. 2006) ("When the parties sign the contract and become bound, they have either made a

lease or a security agreement."); Sankey v. ABCO Leasing, Inc. (In re Sankey), 307 B.R. 674, 683 (D. Alaska 2004) ("[T]he issue of true lease versus disguised security interest is determined based on the facts and circumstances at the inception of the agreement, not those that exist at some later point."); In re Zaleha, 159 B.R. 581, 586 (Bankr. D. Idaho 1993) ("Parties make the agreement at the outset.  It is only there that they have the common intention to create a lease or security agreement, and it is at that time we should measure the economic realities to determine their true intention. . . . Any other timing for this evaluation permits a lease which was believed by the parties at its inception to be a true lease, to be 'transubstantiated' into a security interest if the residual turns out to be more valuable than the parties anticipated at the inception of the transaction." (citations omitted)); In re Standard Financial Management Corp., 79 B.R. 100, 104 (Bankr. D. Mass. 1987) ("The objective is a determination of the intent of the parties at the time the agreement was entered into."); In re Yost, 54 B.R. 818, 820 (Bankr. W.D. Ky. 1985) ("Whether an agreement is a true lease or a security agreement is determined by the objective intent of the parties at the contract's formation."); In re Air Vermont, Inc., 44 B.R. 440, 443 (Bankr. D. Vt. 1984) ("Whether an agreement is a true lease or a security agreement is determined by the objective intent of the parties at formation.").

Further, contracts are to be construed on the assumption that the parties to the contract knew the law and incorporated the law into their agreement when made.

> A contract depends on a regime of common and statutory law for its effectiveness and enforcement.  'Laws which subsist at the time and place of the making of a contract . . . enter into and form a part of it, as fully as if they had been expressly referred to or incorporated in its terms.  This principle embraces alike those laws which affect its construction and those which affect its enforcement or discharge.'

Norfolk & W. R. Co. v. Am. Train Dispatchers' Ass'n, 499 U.S. 117, 129-30 (1991) (quoting Farmers and Merchants Bank of Monroe v. Federal Reserve Bank of Richmond, 262 U.S. 649,

660 (1923)). See also Resolution Trust Corp. v. Diamond, 45 F.3d 665, 673 (2nd Cir. 1995) ("When parties enter into a contract, they are presumed to accept all rights and obligations imposed on their relationship by state (or federal) law."); Ramos v. SimplexGrinnel LP, 796 F.Supp. 346, 362 (E.D.N.Y. 2011) ("When parties enter into a contract, they are 'presumed or deemed to have contracted with reference to' applicable existing laws." (quoting 11 Williston on Contracts § 30: 19 (4th ed.))). Also, "[i]t is . . . a 'cardinal principle of contract construction[] that a document should be read to give effect to all its provisions and to render them consistent with each other.' The same reasoning applies across multiple documents that are incorporated by reference." Pig Newton, Inc. v. Bds. Of Dirs. Of the Motion Picture Indus. Pension Plan, 686 Fed.Appx. 21, 22 (2nd Cir. 2017) (quoting Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 63 (1995)). See also Umbach v. Carrington Inv. Partners (US), 851 F.3d 147, 158 (2nd Cir. 2017) (contracts to be read as a whole and each provision and term to be given effect, so as not to render any part of the contract mere surplusage or illusory or meaningless).

VFI's reading of the Agreements would require the Court to find that an agreement may be transformed from a true lease into a security agreement at some point in time after it is entered into based on some set of facts that might exist at that point in time. The Court must presume that VFI—which drafted the Master Agreement and the Agreements, so that the Master Agreement and the Agreements are to be construed against VFI—knew that the Agreements were either leases or security agreements when executed, and that they could not change thereafter, yet VFI chose to include a nominal purchase option in the Agreements. Given that the Agreements could not be transformed from leases into security agreements based on later events, to construe the Agreements as leases as VFI asks the Court to do would essentially require the Court to read Section 10e of the

Agreements out of the Agreements, as the Section 10e option would become impossible ever to come into effect.

Citing In re ECCO Drilling Co., Ltd., 390 B.R. 221 (Bankr. E.D. Texas 2008) and In re E. Spire Communications, Inc., 2002 Bankr. LEXIS 1230 (Bankr. D. Del. June 20, 2002), VFI states that the Debtors insist that the Master Agreement must be interpreted in its initial form, regardless of subsequent amendments. The Debtors do not argue this. The Debtors argue that the Agreements are the operative documents, and that there is an effective $1.00 purchase option in Section 10e of the Agreements. The ECCO Drilling and E. Spire decisions do not support VFI's argument. Indeed, the ECCO Drilling court observed that "[e]xecution of a document in this type of dispute creates either a lease or a security interest," In re ECCO Drilling Co., Inc., 390 B.R. at 230, which is precisely the argument made above.

Likewise, E. Spire does not support VFI's assertions. In E. Spire, the court was asked to determine whether an agreement was a lease or a security interest. 2002 Bankr. LEXIS at *2. The subject agreement was an amalgamation of the Master Lease Agreement, the Amendment to Master Equipment Lease, and supplemental Schedules for each piece of equipment. Id. at *2-3. The court explained (Id. at *3):

> The Agreement states general terms and conditions. CIT and the Debtor executed a number of Master Equipment Lease Agreement Schedules and amendments thereto, as contemplated by the Agreement. The Schedules incorporate the terms of the Agreement and identify the equipment to be leased, the length of terms of the Agreement, rental payments, and other economic factors, such as "the Termination Value" payable upon the early termination of the Agreement by the Debtor.

Thus, the relevant documents before the E. Spire court largely mirror the documents related to VFI's claim before this Court. To the extent that VFI cites E. Spire for the proposition that "[a] court considered the terms of the originally executed Mater Lease Agreement, together with a later

8

executed Amendment to Master Lease Agreement and later supplemented by lease Schedules," VFI Reply at p. 5, the Debtors agree that this Court should consider the entirety of the Agreements, the Master Agreement and subsequent schedules together.  The Debtors do not, as VFI's argument appears to suggest given the lack of analogous circumstances in the balance of the E. Spire decision, seek to apply only a portion of the Master Agreement or related documents.

Varilease also argues that a contract must be viewed, at the earliest, as of the petition date, and not later than the date the Court is undertaking an analysis of the contract, such as under the *Countryman* test.  See VFI Brief at p. 6; Reply at p. 2.  However, the *Countryman* test is inapposite to the current analysis of whether a security interest or lease was formed as the *Countryman* test seeks to determine whether, at the time of assumption or rejection, a contract is executory.  Logically, the analysis of executoriness (i.e. determining whether parties to a contract have unfulfilled contractual obligations) should take place in present time, since as a general proposition, all contracts would be executory at the time of inception.  The instant determination differs, however, because the Court is not being asked to determine the extent to which performance under a contract has occurred.  Rather, the Court is being asked whether the Agreements constitute a lease or security interest, and must look to the contract at the time the parties became bound for purposes of such an analysis.

**Conclusion**

For the foregoing reasons stated herein, in the Debtors' Objection, and in the Committee Objection, the Debtors request that the Court find that under the Bright Line test the Agreements are security agreements rather than leases and deny the Motion To Compel on that basis.

Dated this 7th day of May, 2018, at Bridgeport, Connecticut.

THE DEBTORS,

*/s/ Christopher H. Blau*_____
Eric Henzy (Federal Bar No. ct12849)
Christopher H. Blau (Federal Bar No. ct30120)
ZEISLER & ZEISLER, P.C.
10 Middle Street, 15th Floor
Bridgeport, CT  06605
Tel. 203-368-4234
Fax 203-367-9678
Email:  ehenzy@zeislaw.com
           cblau@zeislaw.com
Their Attorneys