**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**HARTFORD DIVISION**

_____

| | |
|---|---|
| In re: | CHAPTER 11 |
| | |
| CLINTON NURSERIES, INC. | CASE NO. 17-31897 (JJT) |
| CLINTON NURSERIES OF MARYLAND, INC. | CASE NO. 17-31898 (JJT) |
| CLINTON NURSERIES OF FLORIDA, INC., | CASE NO. 17-31899 (JJT) |
| TRIEM LLC | CASE NO. 17-31900 (JJT) |
| | |
| | Jointly Administered Under |
| | CASE NO. 17-31897 (JJT) |
| | |
| Debtors | RE: ECF Nos. 328, 352 |

_____

**STAGE ONE RULING ON THE MOTION OF VARILEASE**
**TO COMPEL DEBTORS' COMPLIANCE WITH 11 U.S.C. § 365(D)(5)**

*Introduction*

Varilease Finance, Inc., ("Varilease"), through its counsel, has filed a Motion to Compel Debtors' Compliance with 11 U.S.C. § 365(d)(5) ("Motion", ECF No. 328). After an initial hearing on April 26, 2018 where the Court heard preliminary arguments of counsel, it was stipulated upon the record that the Court would adjudicate the issues raised upon the written submissions of counsel in two stages.

In stage one, embodied herein, the Court will review and address a threshold issue of whether this matter involves a "true lease" or a secured transaction based upon the application of the "Bright Line" test. If the transaction involves a true lease, a stage two hearing, briefing and argument will be scheduled to address the appropriate relief to be accorded the Movant. If the Bright Line test otherwise fails to affirmatively answer the true lease inquiry, the Court will proceed to a stage two evidentiary hearing, briefing and argument to complete the record and address any remaining unresolved issues.

*Jurisdiction*

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b), and derives its authority to hear and determine this matter on reference from the District Court pursuant to 28 U.S.C. §§ 157(a) and (b)(1). This is a core proceeding under 28 U.S.C. § 157(b)(2)(B).

*Findings of Fact*

1.  On December 18, 2017, the Debtors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code"). The Debtors have continued to operate their businesses as debtors-in-possession.

2.  On December 22, 2017, the Court entered an order directing that the Debtors' cases be jointly administered.

3.  Varilease claims to be both an equipment lessor to, and secured lender of, Debtors Clinton Nurseries, Inc. ("CNI") and Clinton Nurseries of Maryland, Inc. ("CNM").

4.  CNI is a Connecticut corporation that owns and operates a wholesale plant nursery, growing trees, flowering shrubs, roses, ornamental grasses and ground covers. CNI operates on land located in Westbrook, Connecticut, a portion of which is owned by an affiliate of CNI. As of the Petition Date, CNI employed approximately eighty-four people.

5.  CNM is a Connecticut corporation that is wholly owned by CNI. CNM owns and operates a wholesale plant nursery, growing trees, flowering shrubs, roses, ornamental grasses and ground covers, on land located in Centreville, Maryland, and other locations in Maryland, a portion of which is owned by Triem LLC and a portion of which is owned by an affiliate of CNI. As of the Petition Date, CMI employed approximately fifty-two people.

6.  The Debtors' combined revenue has been in the range of $45 million for the past several years. The Debtors historically have sold their products to a relatively small number of

very large retail seller customers, and at this point the Debtors have two such customers. The Debtors are one of a small handful of vendors with the production capacity to serve the majority of the east coast for these large customers. The quantity of the Debtors' inventory reflects grow times necessary to fulfill order requests across the spectrum of grow times for one "trade" gallon pots to twenty-five "trade" gallon pots. All inventory is potted to meet customers' requirements of no "bound and bagged" plants.

7. On July 16, 2015, Varilease, as lessor, and CNI and CNM, as co-lessees, entered into a master lease agreement ("Master Lease"), whereby Varilease purportedly leased to CNI and CNM certain personal property to be described in schedules to be incorporated into the Master Lease. *See* Mot. Ex. A. On July 16, 2015, CNF executed a guaranty of CNI's and CNM's obligations under the Master Lease. Under Section 2(b) of the Master Lease, CNI and CNM purportedly granted Varilease a security interest in:

> any and all goods, chattels, fixtures, equipment, assets, accounts receivable, contract rights, general intangibles and property of every kind wherever located in which [CNI and CNM] has any interest and proceeds thereof, and agreed that any security interest created by the Master Agreement secures any and all obligations of [CNI and CNM] and those of any affiliate of [CNI and CNM] to [Varilease] whether now in existence and/or to come into existence.

Varilease filed a UCC-1 financing statement with the relevant Connecticut and Maryland filing offices on or about September 28, 2015. *See* Mot. Ex. B.

8. On July 16, 2015, CNI, CNM and Varilease entered into Schedule No. 1 of the Master Lease. Section 1 of Schedule No. 1 provides that the equipment to be leased consists of:

> IT equipment, cabling, software, irrigation equipment, pond liner and related equipment as approved by Lessor together with all other equipment and property hereafter purchased pursuant to the terms of the Lease, and any and all additions, enhancements and replacements thereto. . . . The Equipment shall be more fully and completely described in an Installation Certificate, which shall later be executed by Lessee in connection with the Schedule.

The Installation Certificate executed in connection with Schedule No. 1 details that approximately forty percent of the amount loaned pursuant to Schedule No. 1 was loaned to finance the installation of a holding pond at one of CNM's locations in Maryland. The items purportedly leased included stone, crushed and mixed concrete, and galvanized and steel pipe used to construct the holding pond, short-term rental of heavy equipment such as bulldozers used in the construction work, freight for the delivery of the material used to construct the holding pond, and fees for services such as engineering and surveying. The balance of the equipment consists of the installation of a computer software system. A very large portion of these items consist of services provided rather than hardware or software installed.

9. The original total equipment costs under Schedule No. 1 was $2,075,000.00, the base term of the Master Lease was thirty-six months, and the base monthly rent was $68,890.00 plus applicable sales and use tax. Schedule No. 1 was subsequently amended twice, such that the total equipment cost was $2,288,103.66 and the base monthly rental was $75,965.04.

10. On July 21, 2016, Varilease, CNI and CNM entered into Schedule No. 2 of the Master Lease. The bulk of the equipment purportedly leased under Schedule No. 2 consists of the installation of a computer software system. A very large percentage of the amount related to the computer software system consists of services provided rather than hardware or software installed.

11. The original total equipment costs under Schedule No. 2 was $1,000,000.00, the base term of the Master Lease was thirty-six months, and the base monthly rent was $33,2000.00 plus applicable sales and use tax.

12. Section 3(b) of the Master Lease provides in pertinent part: "SUBJECT TO THE PROVISIONS OF SECTION 19(b), THIS IS A NON-CANCELABLE, NON-TERMINABLE LEASE OF EQUIPMENT FOR THE ENTIRE LEASE TERM AS PROVIDED IN EACH

4

SCHEDULE HERETO." Section 10e of Schedule No. 1 and Schedule No. 2 provides:

> For purposes of this Schedule only, provided no Event of Default has occurred and is continuing, or an event which with the giving of notice or lapse of time, or both, would constitute an Event of Default, Section 19(b)(i) of the Master Agreement shall be deleted in its entirety and replaced with the following: 'purchase all, but not less than all, of the Items of Equipment for one dollar ($1.00).

13. Prior to the Petition Date, the Debtors had paid Varilease approximately $1.7 million.

14. The indebtedness due to Varilease under the Master Lease, per Varilease's Proofs of Claim as of the petition date, was $3,575,442.49, depicted as follows. *See* Mot. Ex. D.

| | |
|---|---|
| **Schedule 01** | |
| Unpaid Rent July 1-December 1, 2017 | $455,790.24 |
| Stipulated Loss Value | $2,202,299.77 |
| **Total Schedule 01** | $2,658,090.11 |
| **Schedule 02** | |
| Unpaid Rent July 1-December 1, 2017 | $140,653.08 |
| Stipulated Loss Value | $ 776,698.69 |
| **Total Schedule 02** | $ 917,352.38 |
| **Total Schedules 01 and 02** | $3,575,442.49 |

The foregoing amounts are exclusive of attorneys' fees, costs, taxes and late charges.

15. The rent claimed due under Schedule No. 1 has been accruing, since the petition date, at the rate of $75,965.04 per month. The rent under Schedule No. 2 has been accruing, since the petition date, at the rate of $23,442.18 per month. Therefore, the total post-petition rent has been accruing at the combined rate of $99,407.22 per month, or $3,313.57 per day, since December 18, 2017.

16. The Debtors have paid no rent since the petition date.

5

*Discussion*

Bankruptcy Code Section 365(d)(5) provides in relevant part:

"The trustee shall timely perform all of the obligations of the debtor, except those specified in Section 365(b)(2), first arising from or after 60 days after the order for relief in a case under chapter 11 of this title under an unexpired lease of personal property (other than personal property leased to an individual primarily for personal, family, or household purposes), until such lease is assumed or rejected notwithstanding Section 503(b)(1) of this title, unless the Court, after notice and a hearing and based on the equities of the case, orders otherwise with respect to the obligations or timely performance thereof."

It is well established that Section 365(d)(5) only applies to what has been characterized as a "true lease." *Wells-Fargo Equip. Fin. v. Circuit-Wise (In Re Circuit-Wise, Inc.)*, 277 B.R. 460, 462 (D. Conn. 2002). Thus, it is "necessary, as a prerequisite to determining whether an equipment lessor has rights under Section 365 … to determine *first* whether the agreement denominated as a lease is indeed a true lease." *Id*. at 464 (emphasis in original).[1]

In this case, the 60-day period identified in Section 365(d)(5) of the Bankruptcy Code expired on February 16, 2018. Accordingly, if the Master Lease is indeed a true lease, the Debtors should be required to pay to Varilease $3,313.57 per day from and after February 16, 2018, as administrative rent. If the Master Lease is a true lease, as of April 30, 2018 the amount of rent owed, excluding the first sixty-day period, will be $241,890.61 (73 days at $3,313.57 per day). Unless the Court orders otherwise, based upon the equities of the case, the Debtors should then be required to immediately pay all unpaid administrative rent due from and after the sixtieth

---

[1] While Varilease may cite Section 8(b) of the Master Lease, which states that the Master Lease is a true lease, as support for its argument, such contractual language has been widely held to be non-determinative and largely irrelevant in the face of Section 1-203. *PSINet, Inc. v. Cisco Sys. Capital Corp. (In re PSINet, Inc.)*, 271 B.R. 1, 44 (S.D.N.Y. 2001) ("The intent of the parties at the time the agreement was entered into is irrelevant to the determination of whether a true lease has been established. The statute [Section 1-203] sets forth a test, which looks to the underlying substance of the transaction. If both parts of the statutory test are met, then, as a matter of law, the transaction is really a sale which created a security interest"). The Court here will give the language contained in Section 8(b) of the Agreement little weight, if any at all.

day through April 30, 2018 totaling $241,890.61, and then $99,047.22 on the first day of each month thereafter, commencing on May 1, 2018.

"Although the Bankruptcy Code contemplates the differences between true leases and secured transactions and the respective rights of the parties that flow from each, state law controls the classification of a contractual agreement as between the two." *Fangio v. Vehifax Corp. (In re Ajax Integrated, LLC)*, 554 B.R. 568, 577-578 (N.D.N.Y 2016) (citing *Powers v. Royce, Inc. (In re Powers)*, 983 F.2d 88, 90 (7th Cir. 1993) ("[a]s courts have consistently recognized, whether a lease constitutes a security interest under the bankruptcy code will depend on whether it constitutes a security interest under applicable state law.")). *See also Rentrak v. Ladieu (In re Ladieu)*, 2011 Bankr. LEXIS 721, [*27] (Bankr. D. Vt. 2011) ("State law determines whether an agreement constitutes a true lease or a security agreement."); *WorldCom, Inc. v. GE Global Asset Mgmt. Servs. (In re Worldcom, Inc.)*, 339 B.R. 56, 63 (Bankr. S.D.N.Y. 2006).

The provision of the Uniform Commercial Code that governs the true lease vs. secured transaction analysis, Section 1-203(a), provides: "Whether a transaction in the form of a lease creates a lease or security interest is determined by the facts of each case." Fundamentally, "a lease involves payment for the temporary possession, use and enjoyment of goods, with the expectation that the goods will be returned to the owner with some expected residual interest of value remaining at the end of the lease term. In contrast . . . a security interest is only an inchoate interest contingent on default and limited to the remaining secured debt." *In re WorldCom, Inc.*, 339 B.R. at 64 (quoting James J. White & Robert S. Summers, Uniform Commercial Code vol. 4, § 30-3, 14 n.18 (5th ed. West 2002)). Critically, "[c]ourts have held that the practical inability of the lessee to return the leased goods due to the cost and difficulty of removal is evidence that a

security interest was created." *Id*. at 74.

Noteworthy here is the nature of the property at issue. As mentioned above, a substantial portion of the amounts obtained from Varilease by CNI and CNM was used to construct a holding pond in Maryland. It would be completely impractical for CNI and CNM to tear up that holding pond, which includes rock and concrete and underground pipes, to give back what would essentially be scrap to Varilease. The cost of doing so would be prohibitive, and the benefit to Varilease minimal. Both the Debtors and Varilease would have been fully aware of this practicality at the time the Master Lease was entered into. The argument that the personal property used to construct the holding pond was to be for the Debtors' "temporary possession, use and enjoyment . . . with the expectation that the goods [would] be returned to [Varilease] with some expected residual interest of value at the end of the lease term" is simply not sensible or logically supportable.

### a. The Bright-Line Test

The analysis under UCC Section 1-203 proceeds in two steps. The first step is the "Bright Line" test and, if the agreement appears to be a lease under that test, courts proceed to a second step, the "Economics of the Transaction" test. *Id*. at 64-65.

"The Bright-Line Test requires the Court to determine whether the contractual terms of the Agreement, either on their face or as applied, bear certain characteristics the statute defines as conclusive evidence that a security interest was created." *Id*. at 65. With respect to the Bright-Line Test, UCC Section 1-203(b) provides:

> A transaction in the form of a lease creates a security interest if the consideration that the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease and is not subject to termination by the lessee, and: (1) the original term of the lease is equal to or greater than the remaining economic life of the goods; (2) the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of

the goods; (3) the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement; or (4) the lessee has an option to become the owner of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement.

The first element of UCC Section 1-203(b) analysis is met here. There can be no dispute that pursuant to the terms of the Master Lease, the Debtors were to pay Varilease for the entire term of the Master Lease. Indeed, Varilease depends on the Debtors' claimed noncompliance with this obligation to assert a right to recover the Stipulated Loss Value, as defined in the Master Lease, of the goods and services contemplated by the Master Lease.

The second element of UCC Section 1-203(b) analysis here is also probative of a secured transaction. Nowhere in the Master Lease is there language granting the Debtors the option of terminating their obligations under the Master Lease. On the contrary, pursuant to Section 3(b) quoted above, the agreement is "non-cancelable" and "non-terminable" outside of very limited end-of-term options outlined in Section 19(b), none of which give the Debtors an opportunity to terminate the Master Lease early.

Finally, the third element of UCC Section 1-203(b) analysis applied to the facts of this case is equally probative of a secured transaction. While the underlying Master Lease does not provide to the Debtors an option to become owners of the relevant personal property, *see* Section 19(b), Section 10e of each of the operative Schedules quoted above provides for a $1.00 purchase option under certain conditions. It is well settled that $1.00 is "nominal consideration." *See PSINet, Inc. v. Cisco Sys. Capital Corp. (In re PSINet, Inc.)*, 271 B.R. 1, 45 (S.D.N.Y. 2001) ("It is well established that an option price of a dollar is nominal within the meaning of [the UCC] and where such an amount is agreed to, there is no need to delve into an analysis of the economic sensibility of purchasing the equipment for that price"); *In re Macklin*, 236 B.R. 403,

407 (E.D. Ark. 1999); *Hunter v. Snap-On Credit Corp. (In re Fox)*, 229 B.R. 160, 165 (N.D. Ohio 1998); *All American Mfg. Corp. v. Quality Textile Screen Prints (In re All American Mfg. Corp.)*, 172 B.R. 394, 398 (S.D. Fla. 1994). Thus, because the Debtors had the option to purchase under the Master Lease for the "nominal additional consideration" of $1.00, the third element of the Section 1-203(b) analysis indicates that the instrument at issue here is a secured transaction.

Varilease defensively argues that the purchase option never came into being because the Debtors defaulted under the Master Lease. Varilease contends, without support, that "[c]haracterization of the Master Lease as a lease versus a security interest must necessarily be analyzed by its terms at the time this Court is called upon to interpret it, not at the time of its execution or at some other prior hypothetical point in time." Mot. 5. However, cases in this Circuit support the conclusion that the date of the transaction, rather than a future date, is the appropriate point in time to determine the parties' rights. *See In re WorldCom, Inc.*, 339 B.R. at 67 ("When the parties sign the contract and become bound, they have either made a lease or a security agreement. That agreement is based upon their present judgments about values, useful life, inflation, risk of non-payment, and other matters. Foresight not hindsight controls.") (quoting White & Summers, § 30-3 at 9). That compliance with the Master Lease is a condition to the right to exercise the option to purchase does not mean that the option only existed if there is no default. Indeed, UCC Section 1-203(b)(4) expressly provides that the "lessee has an option . . . upon compliance with the lease agreement." Because the UCC Section 1-203(b) elements are each met under the Bright Line Test, the Master Lease appears not to be a true lease, but rather a disguised financing transaction that creates a security interest.

*Conclusion*

Accordingly, this Court has made its findings and conclusions with regard to the Bright Line test as stated herein. As agreed, the Court will now move to a stage two evidentiary hearing, briefing and argument to complete the record and address any remaining unresolved issues. This Ruling, while docketed to advance these proceedings, shall not be deemed a final decision until this Court enters its stage two ruling premised upon the Economics of the Transaction Test. Legal counsel for the parties are directed to meet and confer with regard to further scheduling for the stage two hearing, and initiate a telephonic status conference with the Court within ten (10) days hereof to address such matters.

IT IS SO ORDERED at Hartford, Connecticut this 17th day of May 2018.

*James J. Tancredi*
United States Bankruptcy Judge
District of Connecticut