**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
## HARTFORD DIVISION

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| CLINTON NURSERIES, INC., | : | Case No. 17-31897(JJT) |
| CLINTON NURSERIES OF MARYLAND, INC., | : | Case No. 17-31898(JJT) |
| CLINTON NURSERIES OF FLORIDA, INC., and | : | Case No. 17-31899(JJT) |
| TRIEM LLC, | : | Case No. 17-31900(JJT) |
| | : | (Jointly Administered Under |
| Debtors. | : | Case No. 17-31897(JJT)) |

**FOURTH AMENDED DISCLOSURE STATEMENT RELATING TO DEBTORS' FIRST AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

ZEISLER & ZEISLER, P.C.
Eric Henzy (ct12849)
10 Middle Street, 15th Floor
Bridgeport, CT 06604
Tel: (203) 368-4234
ehenzy@zeislaw.com
Counsel for the Debtors and Debtors in Possession

October 28, 2019

# TABLE OF CONTENTS

**EXHIBITS**

EXHIBIT A   Debtors' First Amended Joint Plan Of Reorganization Under Chapter 11 of the Bankruptcy Code

EXHIBIT B  Liquidation Analysis

EXHIBIT C  Financial Projections

### IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

**THE DEADLINE TO VOTE ON THE PLAN IS
_____ __, 2019, AT 4:00 P.M. (PREVAILING EASTERN TIME).**

**FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT
MUST BE ACTUALLY RECEIVED BY THE DEBTORS
ON OR BEFORE THE VOTING DEADLINE AS DESCRIBED HEREIN.**

THIS DISCLOSURE STATEMENT WAS PREPARED TO PROVIDE PARTIES IN INTEREST IN THESE CASES WITH "ADEQUATE INFORMATION" (AS DEFINED IN BANKRUPTCY CODE SECTION 1125) SO THAT THOSE CREDITORS WHO ARE ENTITLED TO VOTE WITH RESPECT TO THE PLAN CAN MAKE AN INFORMED JUDGMENT REGARDING SUCH VOTE ON THE PLAN ANNEXED HERETO AS EXHIBIT A. THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN. THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN; RATHER THIS DISCLOSURE STATEMENT IS INTENDED ONLY TO AID AND SUPPLEMENT SUCH REVIEW. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN AND THE AGREEMENTS AND DOCUMENTS DESCRIBED THEREIN. IF THERE IS A CONFLICT BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE PROVISIONS OF THE PLAN WILL GOVERN. YOU ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND TO READ CAREFULLY THE ENTIRE DISCLOSURE STATEMENT, INCLUDING ANY EXHIBITS TO THE DISCLOSURE STATEMENT, BEFORE DECIDING HOW TO VOTE WITH RESPECT TO THE PLAN.

THIS DISCLOSURE STATEMENT AND ITS RELATED DOCUMENTS ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT THE PLAN. NO REPRESENTATIONS HAVE BEEN AUTHORIZED BY THE BANKRUPTCY COURT CONCERNING THE DEBTORS, THEIR BUSINESS OPERATIONS OR THE VALUE OF THEIR ASSETS, EXCEPT AS EXPLICITLY SET FORTH IN THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND BANKRUPTCY RULE 3016(c). THE PLAN AND THIS DISCLOSURE STATEMENT WERE NOT REQUIRED TO BE PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NONBANKRUPTCY LAW. DISSEMINATION OF THIS DISCLOSURE STATEMENT IS CONTROLLED BY BANKRUPTCY RULE 3017. EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

EXCEPT AS OTHERWISE SET FORTH HEREIN, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE BY THE DEBTORS AS OF THE DATE

HEREOF, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO THE DATE HEREOF OR CREATE ANY DUTY TO UPDATE SUCH INFORMATION. THIS DISCLOSURE STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS BASED PRIMARILY ON THE CURRENT EXPECTATIONS OF THE DEBTORS AND PROJECTIONS ABOUT FUTURE EVENTS AND FINANCIAL TRENDS AFFECTING THE FINANCIAL CONDITION OF THE DEBTORS' AND THE REORGANIZED DEBTORS' BUSINESSES. THESE FORWARD-LOOKING STATEMENTS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS. IN LIGHT OF THESE RISKS AND UNCERTAINTIES, THE FORWARD-LOOKING EVENTS AND CIRCUMSTANCES DISCUSSED IN THE DISCLOSURE STATEMENT MAY NOT OCCUR, AND ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FORWARD-LOOKING STATEMENTS. CONSEQUENTLY, THE PROJECTED FINANCIAL INFORMATION AND OTHER FORWARD-LOOKING STATEMENTS CONTAINED HEREIN SHOULD NOT BE REGARDED AS REPRESENTATIONS BY ANY OF THE DEBTORS, THE REORGANIZED DEBTORS, THEIR ADVISORS OR ANY OTHER PERSON THAT THE PROJECTED FINANCIAL CONDITIONS OR RESULTS OF OPERATIONS CAN OR WILL BE ACHIEVED.

IT IS THE DEBTORS' POSITION THAT THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PERSON, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PERSON, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR EQUITY INTERESTS.

HOLDERS OF CLAIMS OR EQUITY INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. EACH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISOR(S) WITH RESPECT TO ANY SUCH MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION OF VOTES TO ACCEPT THE PLAN, THE PLAN, THE PLAN SUPPLEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY.

**THE DEADLINE TO VOTE ON THE PLAN IS**
**_____ __, 2019, AT 4:00 P.M. (PREVAILING EASTERN TIME).**

**FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT**
**MUST BE ACTUALLY RECEIVED BY THE DEBTORS**
**ON OR BEFORE THE VOTING DEADLINE AS DESCRIBED HEREIN.**

## I.    INTRODUCTION AND SUMMARY

On December 18, 2017 (the "Petition Date"), Clinton Nurseries, Inc. ("CNI"), Clinton Nurseries of Maryland, Inc. ("CNM"), Clinton Nurseries of Florida, Inc. ("CNF"), and Triem LLC (together, the "Debtors"), filed voluntary petitions under Chapter 11 of the United States Bankruptcy Code with the United States Bankruptcy Court for the District of Connecticut, Hartford Division (the "Bankruptcy Court").

The Debtors have proposed and filed with the Bankruptcy Court their Debtors' First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, annexed hereto as Exhibit A (the "Plan"). The Debtors are seeking Confirmation of the Plan by the Bankruptcy Court. This Disclosure Statement is provided pursuant to Bankruptcy Code section 1125 to all known Creditors of the Debtors. The purpose of this Disclosure Statement is to provide the holders of Claims in these Cases with sufficient and adequate information with respect to the Plan to enable such holders to make an informed decision in exercising their right to vote to accept or reject the Plan. This Disclosure Statement discusses, among other things, voting instructions, the history of the Debtors' businesses, classification and treatment of Claims against the Debtors, certain other key provisions of the Plan, certain federal tax consequences of the Plan, and alternatives to Confirmation and Consummation of the Plan.

This Disclosure Statement has been approved by an order of the Bankruptcy Court as containing "adequate information," as that term is defined in Bankruptcy Code section 1125, to enable the Debtors' Creditors to make an informed judgment about whether to accept or reject the Plan. However, the Bankruptcy Court has not passed upon the merits of the Plan or conducted a detailed inquiry into the contents of this Disclosure Statement, and neither this Disclosure Statement nor the order approving it should be construed as an approval or endorsement of the Plan by the Bankruptcy Court.

**Unless otherwise defined herein, capitalized terms used in this Disclosure Statement shall have the meaning ascribed to such terms in the Plan.**

Attached to this Disclosure Statement are the Plan (Exhibit A), a liquidation analysis for the Debtors (Exhibit B), and the Debtors' projected financial information for the period through April 1, 2023 (Exhibit C). These exhibits should be attached to the Disclosure Statement that was served on you. If any of the exhibits identified above were not attached to the Disclosure Statement served on you and you want to obtain copies of such exhibits, you may do so by sending a written request to the Debtors at the following address: Zeisler & Zeisler, P.C., 10 Middle Street, 15th Floor, Bridgeport, CT 06604, Attn: Eric Henzy, Esq.

*A.    The Plan*

1.    <u>Purpose and Effect of the Plan</u>

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor is authorized to restructure its business for the benefit of itself, its creditors and its equity interest holders. In addition to permitting the rehabilitation of a debtor, another goal of Chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated

3

equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a Chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the bankruptcy filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a Chapter 11 plan is the principal objective of a Chapter 11 reorganization case. A Chapter 11 plan sets forth the means for satisfying claims against and equity interests in a debtor. Confirmation of a Chapter 11 plan by the bankruptcy court makes that plan binding upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity interest holder of the debtor. Subject to certain limited exceptions, the order approving confirmation of a plan discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes them the obligations specified under the confirmed plan for such debts.

In general, a Chapter 11 plan of reorganization: (a) divides claims and equity interests into separate classes, (b) specifies the property, if any, that each class is to receive under the plan, and (c) contains other provisions necessary to the restructuring of the debtor that are required or permitted by the Bankruptcy Code.

Pursuant to Bankruptcy Code section 1125, acceptance or rejection of a Chapter 11 plan may not be solicited after the commencement of a Chapter 11 case until such time as the court has approved a disclosure statement as containing adequate information. Pursuant to Bankruptcy Code section 1125(a), "adequate information" is information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding the Chapter 11 plan. To satisfy the applicable disclosure requirements, the Debtors submit this Disclosure Statement to holders of Claims that are impaired and not deemed to have rejected the Plan.

One of the key concepts under the Bankruptcy Code is that only claims and equity interests that are "allowed" may receive distributions under a Chapter 11 plan. This term is used throughout the Plan and the descriptions below. In general, an "allowed" claim or "allowed" equity interest simply means that the debtor agrees, or in the event of a dispute, that the Bankruptcy Court determines, that the claim or equity interest, and the amount thereof, is in fact a valid obligation of the debtor. Bankruptcy Code Section 502(a) provides that a timely filed claim or equity interest is automatically "allowed" unless the debtor or other party in interest objects. However, Bankruptcy Code section 502(b) specifies certain claims that may not be "allowed" in bankruptcy even if a proof of claim is filed. These include, but are not limited to, claims that are unenforceable under the governing agreement between a debtor and the claimant or applicable non-bankruptcy law, claims for unmatured interest, property tax claims in excess of the debtor's equity in the property, claims for services that exceed their reasonable value, real property lease and employment contract rejection damage claims in excess of specified amounts, late-filed claims, and contingent claims for contribution and reimbursement. Additionally, Bankruptcy Rule 3003(c)(2) prohibits the allowance of any claim or equity interest that either is not listed on the debtor's schedules or is listed as disputed, contingent, or unliquidated, if the holder has not filed a proof of claim or equity interest before the established deadline.

The Bankruptcy Code requires that, for purposes of treatment and voting, a Chapter 11 plan divide the different claims against, and equity interests in, the debtor into separate classes based upon their legal nature. Claims of a substantially similar legal nature are usually classified together, as are equity interests of a substantially similar legal nature. Because an entity may hold multiple claims and/or equity interests which give rise to different legal rights, the "claims" and "equity interests" themselves, rather than their holders, are classified.

Under a Chapter 11 plan, the separate classes of claims and equity interests must be designated either as "impaired" (affected by the plan) or "unimpaired" (unaffected by the plan). If a class of claims is "impaired," the Bankruptcy Code affords certain rights to the holders of such claims, such as the right to vote on the plan, and the right to receive under the Chapter 11 plan no less value than the holder would receive if the debtor were liquidated in a case under Chapter 7 of the Bankruptcy Code. Under Bankruptcy Code section 1124, a class of claims or equity interests is "impaired" unless the plan (i) does not alter the legal, equitable and contractual rights of the holders or (ii) irrespective of the holders' acceleration rights, cures all defaults (other than those arising from the debtor's insolvency, the commencement of the case or nonperformance of a nonmonetary obligation), reinstates the maturity of the claims or equity interests in the class, compensates the holders for actual damages incurred as a result of their reasonable reliance upon any acceleration rights, and does not otherwise alter their legal, equitable and contractual rights. Typically, this means that the holder of an unimpaired claim will receive on the later of the consummation date or the date on which amounts owing are actually due and payable, payment in full, in cash, with post-petition interest to the extent appropriate and provided for under the governing agreement (or if there is no agreement, under applicable non-bankruptcy law), and the remainder of the debtor's obligations, if any, will be performed as they come due in accordance with their terms. Thus, other than its right to accelerate the debtor's obligations, the holder of an unimpaired claim will be placed in the position it would have been in had the debtor's case not been commenced. Pursuant to Bankruptcy Code1126(f), holders of unimpaired claims or equity interests are "conclusively presumed" to have accepted the plan. Accordingly, their votes are not solicited.

2.      Summary of Recoveries Under the Plan

The Plan is the product of extensive work and analysis by the Debtors and of negotiation with the Debtors' Creditors. The Plan is a reorganizing plan that contemplates the financial rehabilitation of the Debtors and the continuation of their businesses. The primary purposes of the Plan are to ensure that the Debtors' stable cash flow can service their current obligations and Secured Claims as restructured by the Plan and to compromise the Debtors' obligations to, among others, holders of Allowed Unsecured Claims. The restructuring proposed in the Plan will enable the Debtors to exit Chapter 11, service their debts, and continue their existing operations. The Debtors will retain their assets and operate their businesses after Confirmation of the Plan. The Plan contemplates that the current owners of the Debtors will continue to own the Debtors.

The Plan entails a significant consensual restructuring of the Debtors' obligations to their principal Creditor and secured Creditor, Bank of the West ("BOW"). This restructuring includes a substantial reduction in the amount of the secured indebtedness owed to BOW and an extension of time to service the balance of BOW's Secured Claim. Without this restructuring, the Debtors would not be able to remain in business.

The Debtors estimate that holders of Allowed Unsecured Claims will receive approximately 3.6% on their Claims over a period of ten years, not taking into account recoveries on Avoidance Actions and not discounting for the time value of money.  While the Debtors would prefer to pay a larger dividend to Unsecured Creditors, the level of secured debt makes that impossible if the Debtors are to stay in business.  While the proposed dividend is relatively low, the Debtors believe that the great majority of Unsecured Creditors will benefit by continuing to do business with the Reorganized Debtors.  Indeed, many Creditors, including Creditors on the Committee, have continued  to do business with the Debtors since the Petition Date, in some cases on terms more favorable to such Creditors than existed prior to the Petition Date.  As described herein, the Debtors believe that any alternatives to the Plan would produce less for Creditors than they would receive under the Plan, almost certainly nothing for Unsecured Creditors, and would endanger or terminate the operation of the Debtors' businesses, resulting in, among other things, loss of more than 200 jobs.

The following table classifies Claims against, and Equity Interests in, the Debtors into separate Classes and summarizes the treatment of each Class under the Plan.  The table also identifies which Classes are entitled to vote on the Plan based on the provisions of the Bankruptcy Code.  Finally, the table indicates the estimated recovery for each Class.  The summaries in this table are qualified in their entirety by the description and the treatment of such Claims and Equity Interests in the Plan.  As described in this Disclosure Statement, the Debtors' businesses are subject to a number of risks.  The recoveries and estimates described in the table represent the Debtors' best estimates given the information available on the date of this Disclosure Statement.  All statements relating to the aggregate amount of Claims in each Class are only estimates based on information known to the Debtors as of the date hereof, and the final amounts of Allowed Claims in any particular Class may vary significantly from these estimates.

In accordance with Bankruptcy Code section 1123(a)(1), Administrative Claims, Professional Fees, U.S. Trustee Fees and Priority Tax Claims have not been classified.  Except as specifically noted therein, the Plan does not provide for payment of post-petition interest on any Allowed Claims.

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims in Class | Estimated Recovery |
|---|---|---|---|---|---|
| N/A | Administrative Claims | Paid in full in Cash. | N/A | $750,000 | 100% |
| N/A | Priority Tax Claims | (1) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; (2) Cash in an amount agreed to by such holder and the Debtors or Reorganized Debtors, as applicable; provided, however, that such parties may further agree for the payment of such Allowed Priority Tax Claim at a later date; or (3) at the option of the Debtors, Cash in an aggregate amount of such Allowed Priority Tax Claim | N/A | $0 | 100% |

6

| | | | | | |
|---|---|---|---|---|---|
| | | payable in quarterly installment payments over a period not more than five years after the Petition Date, pursuant to Bankruptcy Code section 1129(a)(9)(C). | | | |
| Class 1 | Priority Non-Tax Claims | On the later of the Effective Date and the date such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, each Entity holding an Allowed Priority Non-Tax Claim will receive on account of such Claim Cash equal to the Allowed amount of such Priority Non-Tax Claim, except to the extent that such holder of an Allowed Priority Non-Tax Claim has been paid by the Debtors prior to the Effective Date and except to the extent that such holder agrees to less favorable treatment. | No | $0 | 100% |
| Class 2 | BOW Secured Claim Against All Debtors | i. BOW shall retain its Liens securing the BOW Real Property Secured Claim. ii. BOW will receive on account of the BOW Secured Claim payments pursuant to the BOW Personal Property Note and BOW Real Property Note. | Yes | $22,400,000 | 100% |
| Class 3 | Varilease Finance Secured Claim Against CNI and CNM | On the Effective Date, in full satisfaction of Varilease Finance's Allowed Secured Claim, CNI and CNM shall abandon to Varilease Finance any property on which Varilease Finance has a valid, perfected, first priority Lien securing Varilease Finance's Allowed Secured Claim | Yes | Approx. $100,000 | 100% |
| Class 4 | Ford Motor Credit Secured Claim | Treated pursuant to Bankruptcy Code section 1124(2). | No | $22,423.56 | 100% |
| Class 5 | Ally Secured Claim | Treated pursuant to Bankruptcy Code section 1124(2). | No | $8,578.30 | 100% |
| Class 6 | Caterpillar Financial Secured Claim | Treated pursuant to Bankruptcy Code section 1124(2). | No | $40,000 | 100% |

7

| Class 7 | Unsecured Claims Against CNI | Pro rata share of the CNI portion of the Unsecured Claim Annual Payment of $200,000 for ten years and net proceeds from any Avoidance Actions of CNI. | Yes | Approx $18 milllion | 3.6% |
|---------|------------------------------|-----------------------------------------------------------------------------------------------------------------------------------------------------------|------|---------------------|------|
| Class 8 | Unsecured Claims Against CNM | Pro rata share of the CNM portion of the Unsecured Claim Annual Payment of $200,000 for ten years and net proceeds from any Avoidance Actions of CNM. | Yes | Approx $19 million | 3.6% |
| Class 9 | Unsecured Claims Against CNF | Pro rata share of the CNF portion of the Unsecured Claim Annual Payment of $200,000 for ten years and net proceeds from any Avoidance Actions of CNF. | Yes | Approx $18.5 million | 3.6% |
| Class 10 | Convenience Claims Against Triem | Paid in full on the Effective Date | No | $172.94 | 100% |
| Class 11 | Intercompany Claims | After Class 1 through 11 are paid pursuant to the terms of the Plan, each holder of an Intercompany Claim shall be entitled to receive payment from the applicable Debtor pursuant to terms to be mutually agreed upon between the applicable Debtor and such holder, in full and complete satisfaction of and in exchange for such Intercompany Claim. | Yes | Approx. $230,000 | 100% |
| Class 12 | Equity Interests | The holders of Equity Interests in each of the Debtors shall retain their Equity Interests, as modified by the terms of the Plan. Holders of Equity Interests shall not be entitled to receive any payment or distribution from the Debtors on account of such Equity Interests until all payments under the Plan to Classes 1 through 11 have been made. | No | NA | 100% |

B.    *Voting and Confirmation Hearing*

In order for the Plan to be Confirmed, Bankruptcy Code section 1129(a) requires that each impaired Class of Allowed Claims in the Plan vote to accept that Plan, subject to certain exceptions. The Bankruptcy Code defines acceptance of a plan of reorganization by a class of creditors as acceptance by holders of two-thirds in dollar amount and a majority in number of the claims in that

class, but for this purpose considers only those creditors that actually cast ballots for acceptance or rejection of a plan. Creditors that fail to vote are not counted as either accepting or rejecting a plan. Only Classes of Claims that are "impaired" are entitled to vote to accept or reject the Plan. As set forth in Bankruptcy Code section 1124, a class is "impaired" if the legal, equitable or contractual rights attaching to the claims of that class are modified by a plan.

The Bankruptcy Code contains provisions for confirmation of a plan even if it is not accepted by all impaired classes, as long as (a) the plan otherwise satisfies the requirements for confirmation, (b) at least one impaired class of claims has accepted the plan without taking into account the votes of any insiders in such class, and (c) the plan is "fair and equitable" and does not "discriminate unfairly" as to any impaired class that has not accepted the plan. These so-called "cramdown" provisions are set forth in Bankruptcy Code section 1129(b).

The Plan provides that if all of the applicable requirements of Bankruptcy Code section 1129(a) other than section 1129(a)(8) thereof with respect to holders of Secured Claims (i.e., acceptance of the Plan by all impaired Classes) are met with respect to the Plan, then the Debtors will request that the Bankruptcy Court, pursuant to Bankruptcy section 1129(b), confirm the Plan notwithstanding the requirements of Bankruptcy Code section 1129(a)(8). In the event that any one or more of Classes 2 or 3 fails to accept the Plan as required by Bankruptcy Code section 1129(a), the Debtors believe that the Plan may be confirmed in accordance with Bankruptcy Code section 1129(b) without amendment or modification. **THE DEBTORS WILL SEEK CONFIRMATION OF THE PLAN UNDER THE CRAMDOWN PROVISIONS IN THE EVENT THAT CLASS 2 OR 3 REJECTS THE PLAN.**

If Class 7, 8 and 9 do not accept the Plan, the Plan as currently structured cannot be confirmed as it will not meet the requirements of the Absolute Priority Rule (defined below). As described herein, the Debtors believe that at this point the Plan is the only alternative available for the Debtors to reorganize, and that if the Debtors do not reorganize Unsecured Creditors will receive nothing and will be deprived of the opportunity to continue to do business with the Debtors. Accordingly, the Debtors are confident that Classes 7, 8 and 9 will vote to accept the Plan.

After carefully reviewing this Disclosure Statement, each holder of an Allowed Claim entitled to vote to accept or reject the Plan should vote on the enclosed ballot and return such ballot so that it is received by 5:00 p.m., Prevailing Eastern Time, on _____ __, 2019. Any ballot that does not indicate either an acceptance or a rejection of the Plan will not be counted toward determining acceptance or rejection of the Plan. A vote to accept or reject the Plan can only be made by proper submission of a duly completed and executed ballot. Any person who holds Claims in more than one Class is required to vote separately with respect to each Class in which such person holds Claims.

**TO BE COUNTED, YOUR PROPERLY FILLED OUT AND EXECUTED BALLOT MUST BE RECEIVED BY COUNSEL FOR THE DEBTORS BY 4:00 P.M. PREVAILING EASTERN TIME ON _____ __, 2019, UNLESS THIS SOLICITATION IS EXTENDED BY ORDER OF THE BANKRUPTCY COURT. BALLOTS RECEIVED AFTER SUCH TIME WILL NOT BE COUNTED. IT IS OF THE UTMOST IMPORTANCE THAT YOU VOTE PROMPTLY TO ACCEPT OR REJECT THE PLAN AFTER CAREFULLY REVIEWING THE PLAN AND THIS DISCLOSURE STATEMENT.**

Ballots are to be sent to counsel for the Debtors at the following address: Zeisler & Zeisler, P.C., 10 Middle Street, 15th Floor, Bridgeport, CT  06604, Attn: Eric Henzy, Esq.  If you wish to change or withdraw your vote after submission of a ballot, Bankruptcy Rule 3018(a) requires that you provide notice and show cause at a hearing before the Bankruptcy Court.

Bankruptcy Code section 1128(a) requires the Bankruptcy Court, after notice, to hold a hearing on Confirmation of the Plan.  The Bankruptcy Court has scheduled a hearing to consider Confirmation of the Plan on _____ __, 2019, at __:___ .m., at the United States Bankruptcy Court, 450 Main Street, Hartford, CT.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of an adjournment date made at the Confirmation Hearing or at any subsequently adjourned Confirmation Hearing.

Bankruptcy Code section 1128(b) provides that any party in interest may object to confirmation of a plan.  Any objection to Confirmation of the Plan must be made in writing and filed with the Bankruptcy Court and served upon: Zeisler & Zeisler, P.C., 10 Middle Street, 15th Floor, Bridgeport, CT  06604, Attn: Eric Henzy, Esq., Attorneys for the Debtors, on or before _____ __, 2019, at 5:00 p.m.  Objections to Confirmation of the Plan are governed by Bankruptcy Rule 9014.  Unless an objection is timely served and filed, it will not be considered by the Bankruptcy Court.

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of Bankruptcy Code section 1129 have been met.  The Debtors believe that the Plan meets the applicable requirements of Bankruptcy Code section 1129 (other than those pertaining to voting, which has not yet taken place) and will seek a ruling of the Bankruptcy Court to this effect at the Confirmation Hearing.

**THE DEBTORS BELIEVE THAT THE PLAN IS IN THE BEST INTERESTS OF CREDITORS.  CREDITORS ARE URGED TO VOTE TO ACCEPT THE PLAN.**

## II.    THE DEBTORS' BUSINESSES AND PRE-PETITION INDEBTEDNESS

*A.    The Debtors' Businesses*

CNI is a Connecticut corporation that owns and operates a wholesale plant nursery, growing trees, flowering shrubs, roses, ornamental grasses and ground covers.  CNI operates on land located in Westbrook, Connecticut, a portion of which is owned by an affiliate of CNI.  As of the Petition Date, CNI employed approximately eighty-four people.

CNM is a Connecticut corporation that is wholly owned by CNI.  CNM owns and operates a wholesale plant nursery, growing trees, flowering shrubs, roses, ornamental grasses and ground covers, on land located in Centreville, Maryland, and other locations in Maryland, a portion of which is owned by Triem and a portion of which is owned by an affiliate of CNI.  As of the Petition Date, CNM employed approximately fifty-two people.

CNF is a Florida corporation that is wholly owned by CNI.  CNF owns and operates a wholesale plant nursery, growing trees, flowering shrubs, roses, ornamental grasses and ground covers, on land it owns located in Havana, Florida.  As of the Petition Date, CNF employed

approximately eighty-six people.

Triem is Connecticut limited liability company that is an affiliate of CNI. Triem owns a house located in Westbrook, Connecticut, and the land located in Centreville, Maryland, on which CNM operates its business.

Prior to the Petition Date, the Debtors' combined revenue was in the range of $45 million for several years. The Debtors historically have sold their products to a relatively small number of very large retail seller customers, and at this point the Debtors have two such very large customers. The Debtors are one of a small handful of vendors with the production capacity to serve the majority of the East Coast for these large customers. The quantity of the Debtors' inventory reflects grow times (in some cases years) necessary to fulfill order requests across the spectrum of grow times for one "trade" gallon pots to twenty-five "trade" gallon pots. All inventory is potted to meet customers' requirements of no "bound and bagged" plants.

The Debtors enjoyed profitable operations for the majority of the ninety-six years they or their predecessors have been in business. Several factors have led to the Debtors' financial distress. In general, there has been an overall consolidation in the wholesale nursery business with the growth of the big box stores as the major customers in the industry and increasing competition. Specific to the Debtors, several years ago one large former customer instituted a new business model that resulted in dramatically eroding margins for suppliers such as the Debtors. At the same time, the Debtors were in the midst of an expansion effort to support its large customers at the time. In addition, in the years preceding the Petition Date, the Debtors suffered loss of inventory at certain of its locations. The Debtors' expansion followed by the decline in business with and eventual loss of the former customer left the Debtors overleveraged. The Debtors' sales are now in the range of $35 million annually, and the Debtors have reduced and rationalized expenses so that they are now profitable at that level of sales.

*B.*    *Prepetition Indebtedness*

1.    <u>BOW</u>

The Debtors' major senior secured creditor is BOW. As of the Petition Date, the Debtors owed BOW approximately $30,000,000.00 as follows:

a.    <u>The Operating Line</u>. BOW and Debtors are parties to that certain "Loan And Security Agreement" dated as of August 18, 2013; as modified by those certain "Modification Agreement(s)" dated as of January 10, 2014, April 4, 2014, June 5, 2014, September 23, 2014, December 15, 2014, March 25, 2015, January 27, 2016, March 16, 2016 and July 29, 2016; and as further modified and amended by that certain "Amendment To Loan And Security Agreement, Line Of Credit Note, And Equipment Purchase Line Of Credit Note" dated as of December 29, 2016 (collectively, the "Operating Agreement"). Pursuant to the Operating Agreement, BOW made available to Debtors a revolving line of credit, subject to all terms and conditions contained in the Operating Agreement (the "Operating Line"). The Operating Line is also evidenced by that certain "Line Of Credit Note" dated as of August 18, 2013, in the original principal amount of $18,000,000.00, and payable from Debtors to the order of BOW, and all other documents, instruments and agreements executed in connection with the Operating Line.

In order to secure the payment and performance of the Operating Line (but not the "Real Estate Loan", as defined below): (i) Section 2.1 of the Operating Agreement contains a grant by Debtors to BOW of a security interest in, a lien on and pledge and assignment of substantially all present and future personal property of the Debtors including, without limitation, all of the Debtors' farm products, accounts, contracts, leases, payment intangibles, general intangibles, patents, licenses, copyrights, trademarks, goodwill, deposit accounts, goods, inventory, equipment, equipment, fixtures, inventory, proceeds and other personal property described in the Operating Agreement (collectively, the "Prepetition Personal Property Collateral"); and (ii) Debtors made, executed and delivered to BOW that certain "Security Agreement" dated as of October 29, 2012, wherein Debtors granted to BOW a security interest in the Prepetition Personal Property Collateral. BOW perfected its security interest in the Prepetition Personal Property Collateral by duly recording UCC-1 Financing Statements with the offices of the Connecticut and Florida Secretaries of State (collectively, and as amended and/or continued from time to time the "Financing Statements").

      b.    <u>The Real Estate Loan</u>. The Debtors made, executed and delivered to BOW that certain "Term Note" dated as of July 12, 2012, in the original principal amount of $4,935,000.00 (as amended and modified from time to time, the "Real Estate Note"). The Real Estate Note evidences a term loan by BOW to Debtors in the original principal amount of $4,935,000.00 (the "Real Estate Loan"). The Real Estate Note is secured by the following mortgages and deeds of trust:

      i.    That certain "Commercial Mortgage, Security Agreement And Assignment Of Leases And Rents" dated as of July 12, 2012, made by Triem, as mortgagor, in favor of BOW (as modified from time to time, the "Connecticut Deed of Trust"). The Connecticut Deed of Trust encumbers all of Triem's right, title and interest in certain real property located at 53 Chapman Avenue, Westbrook, Connecticut 06498, as more fully described in the Connecticut Deed of Trust. BOW perfected its security interest in the Connecticut property by duly recording the Connecticut Deed of Trust in the Official Records of Middlesex County, Connecticut, on November 14, 2012, as Instrument No. 319-612-623.

      ii.    That certain "Deed Of Trust, Security Agreement And Assignment Of Leases And Rents" dated as of July 12, 2012, made by Triem, as trustor, First American Title Company, as trustee, and BOW, as beneficiary (as modified from time to time, the "Maryland Deed of Trust"). The Maryland Deed of Trust encumbers all of Triem's right, title and interest in certain real property located at 613 Hayden Road, Centerville, Maryland 21617, as more fully described in the Maryland Deed of Trust. BOW perfected its security interest in the Maryland property by duly recording the Maryland Deed of Trust in the Official Records of Queen Anne's County, Maryland, on November 14, 2012, as Instrument No. Liber 2147, Folio 033.

      iii.    That certain "Commercial Mortgage, Security Agreement And Assignment Of Leases And Rents" dated as of July 12, 2012, made by CNFI, as mortgagor, in favor of BOW (as modified from time to time, the "Florida Deed of Trust"). The Florida Deed of Trust encumbers all of CNF's right, title and interest in certain real property located at 737 Salem Road, Havana, Florida 32333, as more fully described in the Florida Deed of Trust. BOW perfected its security interest in the Florida property by duly recording the Florida Deed of Trust in Book 767, Page 162, of the Official Records of Gadsden County, Florida, on November 1, 2012.

2.    Varilease Finance, Inc.

Prior to the Petition Date, the CNI and CNM borrowed approximately $2.9 million from Varilease Finance, Inc., pursuant to that certain Master Lease Agreement dated July 16, 2015, and related schedules. Varilease asserts that its Claim is secured by, among other property, a holding pond that is located on real property that is owned by Triem in Maryland (the "Maryland Property"). Varilease asserts that it perfected a Lien on the Maryland Property by filing a fixture filing on the local land records; that Triem on July 16, 2015, executed a waiver in favor of Varilease under which Triem disclaimed any interest in the assets installed and otherwise located at the Maryland Property and subject to Varilease's lien; that on October 7, 2015, Bank of the West subordinated its Lien rights in the Maryland Property to the Lien of Varilease, pursuant to a letter agreement; and that a substantial portion of the assets subject to Varilease's Lien were identified in a sale/leaseback arrangement with CNI and CNM dated July 16, 2015, including, as of that date, the holding pond located on the Maryland Property. Varilease also asserts that it holds a Lien on, among other property, property located in Branford, Connecticut, as a result of a fixture filing. The Debtors do not own any property located in Branford, Connecticut.

The Debtors dispute such assertions by Varilease because, among other reasons, the Debtors assert that they never sold the Maryland Property or any part of it to Varilease; the assertion that Varilease holds a Lien on the holding pond located at the Maryland Property is based in part on Varilease's claim that the agreement pursuant to which it loaned money to the Debtors was a "true lease," but the Bankruptcy Court has already found that to be incorrect and that the agreement was in fact a financing; Varilease does not have and has not asserted a Claim against Triem, and Varilease took no action to create an encumbrance against the Maryland under real property law; and the materials that went into the holding pond and other improvements on the Maryland Property that Varilease now asserts a Lien on were ordinary building materials within the meaning of section 9-334 of the Uniform Commercial Code, so that Varilease does not have a Lien on such property under Article 9 of the Uniform Commercial Code.

The Debtors also believe that Varilease's Claim is grossly overstated. Notwithstanding that the Debtors paid Varilease approximately $1.7 million prior to the Petition Date, Varilease now asserts that it was owed approximately $3.6 million as of the Petition Date. The Debtors have filed or will file an adversary proceeding challenging both the amount of Varilease's Claim and the validity of its asserted Liens.

In addition to the foregoing, Varilease announced at an October 24 hearing in these Cases that it intends to file an election under Bankruptcy Code section 1111(b) to have its entire Claim treated as a Secured Claim. The Debtors believe that Varilease is not entitled to make such an election because the property that secures Varilease's Claim is of inconsequential value and because the Debtors are proposing to abandon such property under the Plan.

The Debtors believe that the foregoing disputes with Varilease will be vigorously contested. While the Debtors are confident that they will be successful in the outcome of such disputes, an unfavorable outcome could materially affect the confirmability and the feasibility of the Plan.

3.    Unsecured Claims

13

Unsecured Claims against CNI total approximately $18 million.   This includes the approximately $8.2 million deficiency Claim of BOW, the approximately $4.8 million Claim of Warren and Ann Richards, the approximately $2 million deficiency Claim of Varilease Finance, and approximately $3 million of vendor and service provider type "trade" Claims.  CNI, CNM and CNF are jointly and severally liable for the BOW, Warren and Ann Richards and Varilease Finance Claims.  Trade Claims total approximately $4 million against CNM and $3.5 million against CNF, so the total Unsecured Claims against CNM and CNF are approximately $19 million and $18.5 million, respectively, due to the joint and several Claims of BOW, Warren and Ann Richards and Varilease Finance.

Prior to the Petition Date, Warren and Ann Richards, the parents of the Debtors' president and majority owner, loaned the Debtors approximately $5 million.  This Claim is secured by a lien on certain of the Debtors' property, but the Debtors believe that such lien is avoidable under Chapter 5 of the Bankruptcy Code.  The Debtors believe that Warren and Ann Richards do not contest that their Lien is avoidable, so that this Claim will be treated as an Unsecured Claim subject to appropriate documentation of the release or avoidance of the Lien.  The Warren and Ann Richards Claim is joint and several against CNI, CNM and CNF.  Warren and Ann Richards loaned this money to the Debtors at a critical point in time when the Debtors would have gone out of business without the money.  The Debtors are aware that the Committee has stated that the Warren and Ann Richards Claims should be subordinated to other Unsecured Claims, but the Committee has never stated a legal basis for this assertion and has never taken action to have the Claims subordinated by Court order.  The Debtors are aware of no basis in law or fact for subordinating the Claims of Warren and Ann Richards.  For the avoidance of doubt, Warren and Ann Richards are not Released Parties under the Plan.

4.    Other Secured Claims

There are four Secured Claims against the Debtors consisting of purchase money financing for vehicles, trucks and the like.  Pre-petition arrearages on such Claims are relatively small, totaling approximately $6,000.00, and as described below under the Plan the Debtors will cure such arrearages and pay the Claims according to their terms.

C.    The Debtors' Cases

The Debtors' principal activities during their Cases have been to stabilize and improve their business and to negotiate a plan of reorganization that would maximize value for all constituencies.  In connection with the first, since the Debtors cases were commenced the Debtors' employees have worked to improve sales and reduce costs, in short to right size their businesses after the reduction in sales described above.  The Debtors are now a profitable approximately $35 million per year business with strong customer and vendor relationships.  The Debtors believe that they are positioned to operate successfully and profitably into the future.

In connection with formulating a Plan, in January 2018, approximately six weeks after the Petition Date, the Court approved the Debtors' employment of TrueNorth Capital Partners as their investment banker.  TrueNorth through the Spring of 2018 sought out and successfully found several refinancing proposals that the Debtors hoped would be the basis for a plan of reorganization.  Unfortunately, the proposals obtained at that time were not acceptable to BOW.  However, the Debtors believe that the investment banking process was critical to the Plan, as it set a range of values

14

for the Debtors businesses and assets that is reflected in the treatment of BOW under the Plan.

After the unsuccessful attempt to obtain refinancing as part of a plan, through the Summer and Fall of 2018, the Debtors and BOW made good faith but unsuccessful efforts to negotiate either a plan of reorganization or a liquidating plan.  At the end of the first quarter of 2019, the Debtors made the decision that they needed to file a plan, and proceeded to negotiate a plan with the Committee.  The Debtors filed a plan in June 2006 that was based on that negotiation and that proposed a "cram down" of BOW, but the Debtors and the Committee never reached a final agreement on a plan.  Recognizing that the confirmation of the plan filed in June would involve expensive, time consuming Court proceedings of uncertain outcome, the Debtors and BOW continued to negotiate a plan which culminated in the Plan, which is consensual between the Debtors and BOW.  Given all of the effort and negotiation of the past two years, the Debtors are convinced that the Plan is the best plan of reorganization achievable in the facts and circumstances, and gives the Debtors their best opportunity to remain in business and return value to Creditors via the distributions provided for in the Plan and the opportunity to continue doing business with the Debtors in the future.

## III.    SUMMARY OF THE PLAN

### A.    *Administrative Claims, Professional Fees, Priority Tax Claims and Statutory Fees*

In accordance with Bankruptcy Code section 1123(a)(1), Administrative Claims and Priority Tax Claims are not classified under the Plan and thus are excluded from the Classes of Claims and Equity Interests set forth in Article III of the Plan.

#### 1.    Administrative Claims

Except with respect to Administrative Claims that are for Professional Fees and except to the extent that an Administrative Claim has already been paid during the Cases or a holder of an Allowed Administrative Claim and the applicable Debtors agree to less favorable treatment, under the Plan each holder of an Allowed Administrative Claim shall be paid in full in Cash on the unpaid portion of its Allowed Administrative Claim on the latest of: (a) on or as soon as reasonably practicable after the Effective Date if such Administrative Claim is Allowed as of the Effective Date; (b) on or as soon as reasonably practicable after the date such Administrative Claim is Allowed; and (c) the date such Allowed Administrative Claim becomes due and payable, or as soon thereafter as is reasonably practicable; provided that Allowed Administrative Claims that arise in the ordinary course of the Debtors' businesses shall be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed by Final Order.

Except as otherwise provided in the Plan and except with respect to Administrative Claims that are for Professional Fees, requests for payment of Allowed Administrative Claims must be Filed and served on the Reorganized Debtors no later than the Administrative Claims Bar Date.  Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative

15

Claims shall be deemed discharged as of the Effective Date.

The Debtors have stayed current with essentially all Administrative Claims other than Professional Fees and rent owed to Richards Farms, so that there are few Administrative Claims that will be paid on the Effective Date, most will be paid in the ordinary course according to their terms. As described further below, the principal unpaid Administrative Claim will be for unpaid pre- and post-petition rent to Richards Farms, which is an Affiliate of the Debtors and leases the land in Connecticut to CNI that CNI operates on and land in Maryland that CNM operates on. Such unpaid rent totals approximately $1 million, and will be paid in connection with CNI's and CNM's assumption of the Unexpired Leases with Richards Farms. Richards Farms is owned by David Richards (the president and principal owner of CNI), David Richards's son Matthew Richards (an employee and owner of CNI), and several other children of David Richards. The land has been owned by Richards Farms for decades.

2.      Professional Fees

The Plan provides that all final requests for payment of Professional Fees incurred during the period from the Petition Date through the Effective Date shall be Filed no later than thirty (30) days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules and prior Court orders, the Allowed amounts of such Professional Fees shall be determined by the Court. The amount of Professional Fees owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtors.

The Plan provides that to receive payment for unbilled fees and expenses incurred through the Confirmation Date, the Debtors' and the Committee's Professionals shall estimate their Professional Fees before and as of the Confirmation Date and shall deliver such estimate to the Debtors no later than ten (10) days prior to the Confirmation Date (it being understood that it shall not be a condition precedent to the occurrence of Confirmation that such estimates have been provided); provided, however, that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional, and such Professionals are not bound to any extent by the estimates. If any of the Debtors' or the Committee's Professionals fail to provide an estimate or does not provide a timely estimate, the Debtors may estimate the unbilled fees and expenses of such Professional. The total amount so estimated shall be utilized by the Debtors to determine the Administrative Claims as of the Effective Date. At present, the Debtors estimate that unpaid Professional Fees as of Confirmation will total $750,000.00 or less.

The Plan provides that, except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Debtors. Upon the Confirmation Date, any requirement that Professionals comply with Bankruptcy Code sections 327 through 331 and 1103 in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Court.

3.      Priority Tax Claims

Under the Plan, except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement release and discharge of each Allowed Priority Tax Claim, on the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtors or Reorganized Debtors: (1) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; (2) Cash in an amount agreed to by such holder and the Debtors or Reorganized Debtors, as applicable; provided, however, that such parties may further agree for the payment of such Allowed Priority Tax Claim at a later date; or (3) at the option of the Debtors, Cash in an aggregate amount of such Allowed Priority Tax Claim payable in quarterly installment payments over a period not more than five years after the Petition Date, pursuant to Bankruptcy Code section 1129(a)(9)(C). The Debtors believe that there are no Priority Tax Claims.

    4.    <u>Statutory Fees</u>

Under the Plan, all fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code prior to the Effective Date shall be paid by the Debtors. On and after the Effective Date, the Reorganized Debtors shall pay any and all such fees when due and payable, and shall file with the Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.

On April 17, 2019, the Debtors filed their Motion To Determine Amount Of United States Trustee Fees Pursuant To 28 U.S.C. § 1930(a)(6), Doc. No. 672, seeking an order that the Debtors US Trustee fee obligation should be paid at the lower pre-October 27, 2017 schedule. The US Trustee objected to the Debtors' motion, and as part of the pre-trial order governing such motion the US Trustee agreed that US Trustee fees did not have to be paid pending resolution of the motion. The Debtors' motion was denied by the Bankruptcy Court on August 28, 2019, and the Debtors timely filed an appeal of that denial. The US Trustee's position is that the Debtors owe $297,022.83 in US Trustee fees as of the end of the third quarter of 2019. Unless the Debtors have obtained a stay pending appeal, the Debtors shall be required to pay any outstanding US Trustee fees on the Effective Date. The Debtors believe that this will not impact the feasibility of the Plan. If the Debtors file a motion for a stay pending appeal, they will be required to demonstrate, among other things, that they have a likelihood of success on their appeal and that they will be irreparably harmed if a stay is not granted.

*B.*    *Classification and Treatment of Claims and Equity Interests*

The Plan classifies Claims and Equity Interests separately in accordance with the Bankruptcy Code and provides different treatment for different Classes of Claims and Equity Interests. The Plan separates the various Claims and Equity Interests (other than those that do not need to be classified) into twelve (12) separate Classes. These Classes take into account the differing nature and priority of Claims against, and Equity Interests in, the Debtors.

Other than as specifically provided in the Plan, the treatment under the Plan of each Claim and Interest will be in full satisfaction, settlement, release and discharge of all Claims or Equity Interests. The Debtors will make all payments and other distributions to be made under the Plan unless

otherwise specified.

1.    <u>Class 1—Allowed Priority Non-Tax Claims</u>.  Class 1 consists of any unpaid Allowed Priority Non-Tax Claims against the Debtors.  Under the Plan, this Class is not impaired under and holders of Allowed Claims in this Class are conclusively presumed to have accepted the Plan, and the Debtors are not required to solicit acceptances from any holders of Claims in this Class. Under the Plan, on the later of the Effective Date and the date such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, each Entity holding an Allowed Priority Non-Tax Claim will receive Cash equal to the Allowed amount of such Priority Non-Tax Claim, except to the extent that such holder of an Allowed Priority Non-Tax Claim has been paid by the Debtors prior to the Effective Date and except to the extent that such holder agrees to less favorable treatment.  The principal Priority Non-Tax Claims were for pre-petition wages and benefits Claims of the Debtors' employees, which were paid pursuant to Court order.  The Debtors believe that there are no remaining unpaid Priority Non-Tax Claims.

2.    <u>Class 2—BOW Secured Claims</u>.  Class 2 consists of the Secured Claims of BOW against the Debtors.  On April 9, 2018, BOW filed a proof of claim stating that as of April 2018 the outstanding principal balance of the BOW Claims, plus fees and costs, was approximately $29,418,576.39, together with accrued and unpaid interest, costs of collection and attorneys' fees and costs.  Pursuant to cash collateral orders entered in the Cases, (i) the Claims of BOW constitute Allowed Claims against the Debtors and are not subject to any contest, objection, recoupment, counterclaim, defense, offset, subordination, recharacterization, avoidance, or other claim, challenge, or cause of action under the Bankruptcy Code, applicable non-bankruptcy law, or otherwise and BOW's Liens have been deemed legal, valid, binding, enforceable, duly perfected, not subject to any objection, counterclaim, setoff, offset of any kind, subordination, or defense, and such liens are otherwise unavoidable; and (ii) BOW is not be subject to any other or further claims, counterclaims, causes of action or lawsuits by any representative of the estate with respect to acts or omissions occurring prior to the Petition Date.

Under the Plan, this Class is impaired and BOW is entitled to vote to accept or reject the Plan. Under the Plan, in full, complete and final satisfaction and release of the BOW Secured Claims, pursuant to the BOW Personal Property Note and the BOW Real Property Note and the other BOW Amended Loan Documents BOW shall:

a.    Retain its Liens on the Debtors' Personal Property as security for the BOW Personal Property Note and the Real Property as security for the BOW Real Property Note, in the same priority as they currently exist, subject to the release provisions set forth below.

b.    Receive from the Debtors on account of its Secured Claims:

i.    The BOW Personal Property Note in the amount of $15 million, payable as follows: (A) On the first day of each month from the Effective Date through and including April 1, 2023, equal monthly principal and interest payments based on a ten (10) year amortization schedule and a seven and one-half percent (7.5%) annual rate of interest. (B)  In addition to the monthly principal and interest payments, to the extent the Debtors have cash in excess of $2,500,000.00 on February 28 in any calendar year through and including February 28, 2023, the Debtors shall pay to BOW fifty percent (50%) of such excess, to be applied by BOW in reverse order of maturity on the BOW

18

Personal Property Note (i.e., applied to the "back-end" principal balance owing on the BOW Personal Property Secured Claim so as not to delay any regularly scheduled monthly P & I payments); provided, however that upon receipt of any excess cash, all payments on the BOW Personal Property Note will remain the same, but as the principal balance reduces, a larger percentage of each monthly payment will be for principal, and less to interest.

The maturity date of the BOW Personal Property Note will be April 1, 2023, unless the Debtors produce a reasonably satisfactory letter of intent/commitment letter from a lender sufficient to close a refinance of the BOW Personal Property Note and the BOW Real Property Note, in full, by no later than April 30, 2023, in which case April 30, 2023 will become the new maturity date of the BOW Personal Property Note and the BOW Real Property Note. The Debtors shall have the option to pre-pay the BOW Personal Property Note with no penalty. If the Debtors default on their obligations to BOW under the Plan, BOW will have all state law and other applicable remedies to enforce the BOW Amended Loan Documents, including the ability to seek the appointment of a receiver to liquidate the Personal Property. The BOW Personal Property Note will be evidenced by the BOW Credit Agreement, security agreements and other BOW Amended Loan Documents satisfactory to the Debtors and BOW. The BOW Credit Agreement shall contain mutually-acceptable reporting requirements, and BOW will have mutually-acceptable inspection rights (similar to what the parties have operated under over the past few years). The BOW Credit Agreement shall contain mutually-satisfactory financial covenants to be agreed-upon by BOW and the Debtors.

ii.      The BOW Real Property Note in the amount of $7,400,000.00, payable as follows: On the first day of each month from the Effective Date through and including April 1, 2023, equal monthly principal and interest payments based on a thirty (30) year amortization schedule and a four and one-quarter percent (4.25%) annual rate of interest.

The maturity date of the BOW Real Property Note will be April 1, 2023, unless the Debtors produce a reasonably satisfactory letter of intent/commitment letter from a lender sufficient to close a refinance of the BOW Real Property Note and the BOW Personal Property Note, in full, by no later than April 30, 2023, in which case April 30, 2023 will become the new maturity date of the BOW Real Property Note and the BOW Personal Property Note. The Debtors shall have the option to pre-pay the BOW Real Property Note with no penalty. If the Debtors default on their obligations to BOW under the amended Plan, BOW will have all state law and other applicable remedies to enforce the BOW Amended Loan Documents, including the ability to seek the appointment of a receiver to liquidate the Real Property. The BOW Real Property Note will be evidenced by the BOW Credit Agreement, the other BOW Amended Loan Documents, as well as amendments to the existing mortgages on all Real Property to reflect that each mortgage jointly & severally secures the BOW Real Property Note. The BOW Real Property Note will be "non-recourse" to any of the Debtors. Accordingly, the total amount payable by the Debtors to BOW under the BOW Real Property Note will be the lesser of: (i) $7,400,000.00 (plus any interest previously paid); (ii) the aggregate net proceeds realized from disposition of the Real Estate securing the BOW Real Property Note; or (iii) as applicable, the Allocable Values. In any case, BOW will have no further recourse to the Debtors beyond the funds received upon disposition of the Real Estate.

The Debtors shall apply net proceeds from the sale of all Real Property to reduce the BOW Real Property Note. BOW agrees to release its Liens on the Real Property in connection with a

19

closing of a sale of Real Property so long as BOW receives all net proceeds from the sale of said Real Property; provided, however, that if BOW, in its sole and absolute discretion, believes that the proposed sale price of any of the Real Property securing the BOW Real Property Note is not acceptable to BOW, then the Debtors shall immediately take all reasonable steps to deed, transfer and assign all legal, beneficial and equitable interest in said Real Property to BOW (or BOW's designee), and BOW agrees that the outstanding balance of the BOW Real Property Note shall be reduced by the Allocable Value of said Real Property.

For purpose of the Plan, the Debtors and BOW agree to the following Allocable Values of the Real Property, which Allocable Values shall be binding for all purposes upon the Debtors and BOW following the Effective Date of the Plan. Debtors and BOW further agree that upon a sale of any Real Property, the principal amount of the BOW Real Property Note will be reduced by the greater of: (i) the actual net proceeds received by BOW for said Real Property; or (ii) the Allocable Value of said Real Property, as set forth immediately below:

| Real Property | Allocable Value |
|---|---|
| • Connecticut Property: | $   873,292.00 |
| • Florida Property: | $3,125,466.00 |
| • Maryland Property: | $3,401,242.00 |

c.      BOW Unsecured Claim. The BOW Unsecured Claim, which is equal to $22,400,000.00 minus the total amount of the BOW Claim, will be treated as a Class 7, 8 and 9 Unsecured Claim.

3.      Class 3—Allowed Secured Claim of Varilease Finance, Inc. Against CNI and CNM. Class 3 consists of the Allowed Secured Claim of Varilease Finance, Inc., against CNI and CNM. This Claim is secured by first priority liens on certain computer equipment owned by CNI and certain vehicles and equipment owned by CNM that the Debtors' believe have an aggregate value of approximately $100,000.00. This Class is impaired under and Varilease Finance is entitled to vote to accept or reject the Plan. Under the Plan, on the Effective Date, in full satisfaction of Varilease Finance's Allowed Secured Claim, CNI and CNM shall abandon to Varilease Finance any property on which Varilease Finance has a valid, perfected, first priority Lien securing Varilease Finance's Allowed Secured Claim.

As described above, Varilease Finance asserts liens on certain other property, namely improvements on the real property owned by Triem in Maryland. In addition, Varilease announced at an October 24 hearing in these Cases that it intends to file an election under Bankruptcy Code section 1111(b) to have its entire Claim treated as a Secured Claim. The Debtors believe that Varilease is not entitled to make such an election because the property that secures Varilease's Claim is of inconsequential value and because the Debtors are proposing to abandon such property under the Plan. The Debtors believe that the foregoing disputes with Varilease will be vigorously contested. While the Debtors are confident that they will be successful in the outcome of such disputes, an unfavorable outcome could materially affect the confirmability and the feasibility of the Plan

4.      Classes 4, 5 and 6—Allowed Secured Claims of Ford Motor Credit Company Against CNI, of Ally Against CNI, and of Caterpillar Financial Services Corp. Against CNM. Classes 4, 5 and 6 consist of the Allowed Secured Claims of Ford Motor Credit Company against CNI, of Ally

Against CNI, and of Caterpillar Financial Services Corp. Against CNM, respectively. The arrearages on these Claims are Ford $ 1,912.63, Ally $ 857.84 and Caterpillar $ 3,378.22. The principal amounts remaining due on these Claims are Ford $22,423.56, Ally $8,578.30 and Caterpillar approximately $40,000.00. These Classes are not impaired under and are conclusively presumed to have accepted the Plan, and CNI and CNM are not required to solicit acceptance from the holders of the Claims in these Classes. Under the Plan, on the Effective Date, (i) CNI or CNM, as the case may be, shall cure any default on the Claim that occurred before or after the commencement of the Cases, other than a default of a kind specified in Bankruptcy Code section 365(b)(2) or of a kind that Bankruptcy Code section 365(b)(2) expressly does not require to be cured; (ii) the maturity of such claim shall be reinstated as such maturity existed before any such default; (iii) CNI or CNM, as the case may be, shall compensate the holder of the Claim for any damages incurred as a result of any reasonable reliance by such holder on any contractual provision or applicable law that entitled such holder to demand or receive accelerated payment of such claim after the occurrence of any default; (iv) if such Claim arose from any failure to perform a nonmonetary obligation, CNI or CNM, as the case may be, shall compensate such holder for any actual pecuniary loss incurred as a result of such failure; and (v) the legal, equitable, or contractual rights to which such Claim entitles the holder shall not otherwise be altered.

5.     Class 7—Allowed Unsecured Claims Against CNI.   Class 7 consists of Allowed Unsecured Claims against CNI.   As described above, Unsecured Claims against CNI total approximately $18 million, including the joint and several Claims of BOW, Warren and Ann Richards and Varilease Finance.

This Class is impaired under and holders of Allowed Claims in this Class are entitled to vote to accept or reject the Plan.  Holders of Class 7 Claims will receive, in full, complete and final satisfaction and release of their Allowed Unsecured Claims, their Pro Rata share of the CNI portion of the Unsecured Claim Annual Payment of $200,000.00 for ten years and net proceeds from any Avoidance Actions of a Debtor against which such holder has a Claim.  The Debtors estimate that Creditors in this Class will receive approximately 3.6% on their Claims not including any recoveries on account of Avoidance Actions.  Potential Recoveries under Avoidance Actions are described below.

For as long as the CN Trust is in existence, the Debtors will make the Unsecured Claim Annual Payment to the CN Trust on June 1 of the applicable year.  The CN Trustee shall make a distribution to Class 7 Allowed Unsecured Claims at least annually and within thirty days of receiving the foregoing payments from the Debtors.  Upon dissolution of the CN Trust, the Debtors shall make any remaining distributions to Class 7 Creditors directly on or before July 1 of the applicable year.

6.     Class 8—Allowed Unsecured Claims Against CNM.   Class 8 consists of Allowed Unsecured Claims against CNM.   As described above, Unsecured Claims against CNI total approximately $19 million, including the joint and several Claims of BOW, Warren and Ann Richards and Varilease Finance.

This Class is impaired under and holders of Allowed Claims in this Class are entitled to vote to accept or reject the Plan.  Holders of Class 8 Claims will receive, in full, complete and final satisfaction and release of their Allowed Unsecured Claims, their Pro Rata share of the CNM portion

of the Unsecured Claim Annual Payment of $200,000.00 for ten years and net proceeds from any Avoidance Actions of a Debtor against which such holder has a Claim. The Debtors estimate that Creditors in this Class will receive approximately 3.6% on their Claims not including any recoveries on account of Avoidance Actions. Potential Recoveries under Avoidance Actions are described below.

For as long as the CN Trust is in existence, the Debtors will make the Unsecured Claim Annual Payment to the CN Trust on June 1 of the applicable year. The CN Trustee shall make a distribution to Class 8 Allowed Unsecured Claims at least annually and within thirty days of receiving the foregoing payments from the Debtors. Upon dissolution of the CN Trust, the Debtors shall make any remaining distributions to Class 8 Creditors directly on or before July 1 of the applicable year.

> 7.   Class 9—Allowed Unsecured Claims Against CNF. Class 9 consists of Allowed Unsecured Claims against CNF. As described above, Unsecured Claims against CNF total approximately $18.5 million, including the joint and several Claims of BOW, Warren and Ann Richards and Varilease Finance.

This Class is impaired under and holders of Allowed Claims in this Class are entitled to vote to accept or reject the Plan. Holders of Class 9 Claims will receive, in full, complete and final satisfaction and release of their Allowed Unsecured Claims, their Pro Rata share of the CNF portion of the Unsecured Claim Annual Payment of $200,000.00 for ten years and net proceeds from any Avoidance Actions of a Debtor against which such holder has a Claim. The Debtors estimate that Creditors in this Class will receive approximately 3.6% on their Claims not including any recoveries on account of Avoidance Actions. Potential Recoveries under Avoidance Actions are described below.

For as long as the CN Trust is in existence, the Debtors will make the Unsecured Claim Annual Payment to the CN Trust on June 1 of the applicable year. The CN Trustee shall make a distribution to Class 9 Allowed Unsecured Claims at least annually and within thirty days of receiving the foregoing payments from the Debtors. Upon dissolution of the CN Trust, the Debtors shall make any remaining distributions to Class 9 Creditors directly on or before July 1 of the applicable year.

> 8.   Class 10--Convenience Claims Against Triem. Class 10 consists of two Unsecured Claims against Triem totaling $172.94. This Class is not impaired under and is conclusively presumed to have accepted the Plan, and Triem is not required to solicit acceptance from the holders of the Claim in this Class. These Claims will receive Cash equal to the Allowed amount of such Claims on the Effective Date.

> 9.   Class 11—Intercompany Claims. Class 11 consists of Intercompany Claims in the total amount of approximately $230,000.00. This Class is impaired under and holders of Claims in this Class are entitled to vote to accept or reject the Plan. After Classes 1 through 10 are paid pursuant to the terms of the Plan, each holder of an Intercompany Claim shall be entitled to receive payment from the applicable Debtor pursuant to terms to be mutually agreed upon between the applicable Debtor and such holder, in full and complete satisfaction of and in exchange for such Intercompany Claim.

10.  <u>Class 12—Equity Interests.</u>  Class 12 consists of Equity Interests in the Debtors.  This Class is not impaired under and is conclusively presumed to have accepted the Plan, and the Debtors are not required to solicit acceptance from the holders of the Equity Interests.  The holders of Equity Interests in each of the Debtors shall retain their Equity Interests, as modified by the terms of the Plan.  Holders of Equity Interests shall not be entitled to receive any payment or distribution from the Debtors on account of such Equity Interests until all payments under the Plan to Classes 1 through 11 have been made.

C.    *Certain Other Plan Provisions*

Although the Plan is presented as a joint plan of reorganization, the Plan does not provide for the substantive consolidation of the Debtors' Estates, and on the Effective Date, the Debtors' Estates shall not be deemed to be substantively consolidated for any reason.  Nothing in the Plan or the Disclosure Statement shall constitute or be deemed to constitute an admission that any one or all of the Debtors is subject to or liable for any Claims against any other Debtor.

The Plan provides that, except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights in respect of any unimpaired Claims, including, but not limited to, all rights in respect of legal and equitable defenses to or setoffs or recoupment against any such unimpaired Claims.

The Plan provides that the Debtors shall seek Confirmation of the Plan pursuant to Bankruptcy Code section 1129(b) with respect to Class 2 or 3 if they reject the Plan.

D.    *Means for Implementation of the Plan*

The Plan provides, among other things, that:

On the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved by the Court in all respects, and the Reorganized Debtors shall be authorized and directed to take all actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the Reorganized Debtors to make payments required pursuant to the Plan will be obtained from the Reorganized Debtors' Cash balances, including Cash from operations, from financing or other capital investment to be obtained by the Debtors, and from net proceeds from the sale of any assets of the Reorganized Debtors.  Cash payments to be made pursuant to the Plan will be made by the Reorganized Debtors, with the exception of payments to be made by the CN Trustee as provided in the Plan.

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan, each Debtor shall continue to exist after the Effective Date as a separate legal entity, with all the powers of a corporation or limited liability company, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or

formed and pursuant to the respective certificate of incorporation and by-laws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in each of the Debtors' estates shall vest with the applicable Debtor, free and clear of all Liens, Claims, charges, or other encumbrances except as otherwise provided in the Plan. On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

On the Effective Date, the Debtors shall enter into the CN Trust Agreement and all other agreements necessary to effectuate the Plan. Each of the officers of the Debtors is authorized and directed to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

On the Effective Date, all managers, directors, and other members of the existing boards or governance bodies of the Debtors, as applicable, shall remain in place.

Except as otherwise provided in the Plan, and with the exception of the Avoidance Actions which are being transferred to the CN Trust and preserved for the benefit of Class 7, 8 and 9 Creditors, in accordance with Bankruptcy Code section 1123(b) and as otherwise may be set forth in the Plan, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Causes of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Court order, the Debtors or Reorganized Debtors, as applicable, expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation of the Plan. Except as otherwise provided in the Plan, the Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Court. The Plan provides that for the avoidance of doubt, the Debtors may not pursue any Cause of Action against BOW that has been released or otherwise extinguished pursuant to the cash collateral orders entered

24

in the Cases, any other order entered by the Court in the Cases, any agreement between the Debtors and BOW, or applicable law.

The Plan provides that on the Effective Date, except as otherwise specifically provided for in the Plan, and with the exception of the BOW Loan Documents, the obligations under any document, note, bond, indenture, warrant or other instrument directly or indirectly evidencing or creating any indebtedness or obligation of the Debtors shall be cancelled and the Debtors shall not have any continuing obligations thereunder.

E.      *The CN Trust*

On the Effective Date, the CN Trustee shall execute the CN Trust Agreement (which shall be filed as part of the Plan Supplement with the Bankruptcy Court at least fourteen days prior to the Confirmation Hearing) and take all steps necessary to establish the CN Trust in accordance with the Plan and the CN Trust Agreement. The Debtors shall be deemed to have transferred to the CN Trust all of their rights, title and interest in and to all of the Avoidance Actions, and the Debtors shall transfer to the CN Trust the CN Trust Initial Cash in the amount of $50,000.00. Such transfers shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax. The CN Trust shall be governed by the CN Trust Agreement and administered by the CN Trustee. In the event of any conflict between the terms of the Plan and the terms of the CN Trust Agreement, the terms of the CN Trust Agreement shall govern.

The CN Trust shall be established for the purpose of liquidating the CN Trust Assets, distributing such assets, and reconciling and objecting, if necessary, to Disputed Unsecured Claims, and is intended to qualify as a liquidation trust pursuant to Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary and consistent with, the purpose of the CN Trust.

The CN Trust Agreement generally will provide for, among other things: (a) the payment of the CN Trust expenses; (b) the payment of other reasonable expenses of the CN Trust, including the cost of pursuing the Avoidance Actions; (c) the retention of counsel, accountants, financial advisors or other Professionals and the payment of their reasonable compensation; (d) the investment of Cash by the CN Trustee within certain limitations, including those specified in the Plan; (e) the orderly liquidation of the CN Trust Assets; and (f) litigation of the Avoidance Actions, which may include the prosecution, settlement, abandonment or dismissal of any such Avoidance Actions.

The CN Trust shall be funded from the CN Initial Cash and proceeds of the CN Trust Assets. For the avoidance of doubt, the CN Trust costs and expenses shall be paid from the CN Trust Assets in accordance with the Plan and CN Trust Agreement, and the Debtors shall have no further obligation for the costs or expenses of the CN Trust.

The CN Trustee shall be selected by the Committee and shall be appointed on the Effective Date. The CN Trustee shall be compensated on terms acceptable to the Committee. The CN Trustee shall not have voting rights with respect to the governance of the CN Trust and shall retain professionals approved by consent of the CN Trust Advisory Board.

The CN Trustee shall be the exclusive trustee of the assets of the CN Trust for purposes of

31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(4).  The powers, rights and responsibilities of the CN Trustee shall be specified in the CN Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this Article III.E.  The CN Trustee shall hold and distribute the CN Trust Assets in accordance with the provisions of the Plan and the CN Trust Agreement.

The CN Trust shall be governed by the CN Trust Advisory Board as set forth in the CN Trust Agreement.  The members of the CN Trust Advisory Board shall not be entitled to compensation for service on the CN Trust Advisory Board.

CN Trust Interests shall be passive and shall not have voting, consent or other shareholder-like control rights with respect to the CN Trust.  CN Trust Interests may be structured not to be securities and may or may not be transferable, in each case subject to applicable law and as otherwise determined by the CN Trust Advisory Board as provided in the CN Trust Agreement.

To effectively investigate, prosecute, compromise, and/or settle the Avoidance Actions on behalf of the CN Trust, the CN Trustee and its counsel may require reasonable access to the Debtors' and Reorganized Debtors' documents, information and work product relating to the CN Trust Assets, and, in such event, must be able to exchange such information with the Reorganized Debtors on a confidential basis and as protected by the common interest privilege without being restricted by or waiving any applicable work product, attorney-client, or other privilege.  Accordingly, the CN Trust Agreement shall provide for the CN Trustee to have reasonable access to copies of the Debtors' and Reorganized Debtors' records and information relating to the CN Trust Assets, including, electronic records, documents or work product related to the Avoidance Actions, to the extent consistent with applicable law, but shall further provide that any records or information so shared shall continue to be protected by the attorney-client, work product, or common interest privilege and the CN Trustee's access thereto shall not waive any of the Debtors' or the Reorganized Debtors' privileges or similar protections referenced in this paragraph.  The CN Trust Agreement shall also provide that the CN Trustee may not waive any privileges referenced in this paragraph belonging to or shared with the Debtors or the Reorganized Debtors in respect of such records and documents, and that the Debtors and the Reorganized Debtors shall be provided with reasonable notice and an opportunity to protect their rights with respect to any subsequent disclosure and the terms of any protective order, confidentiality stipulation, or similar agreement relating to such disclosure.

The Reorganized Debtors shall preserve all records, documents or work product (including all electronic records, documents or work product) related to the Avoidance Actions until the earlier of (1) such time as the CN Trustee notifies the Reorganized Debtors in writing that such records are no longer required to be preserved and (2) the termination of the CN Trust.  The Reorganized Debtors shall reasonably cooperate with the CN Trustee with reasonable requests for interviews of current and former officers, directors, employees, and professionals of the Debtors in order to facilitate prosecution of the Avoidance Actions; provided, however, that the Reorganized Debtors shall be reimbursed for any reasonable and documented out-of-pocket expenses in connection with such cooperation.

The CN Trustee and each member of the CN Trust Advisory Board shall owe fiduciary duties to the holders of CN Trust Interests of the type that an official committee of unsecured creditors would owe to unsecured creditors, and shall have in place under the CN Trust Agreement applicable

26

indemnity and waiver provisions to protect the CN Trustee and each member of the CN Trust Advisory Board from being personally liable for any claims or causes of action asserted by the holders of CN Trust Interests, except for any clams of fraud, gross negligence, or willful misconduct.

For all U.S. federal income tax purposes, all parties, the CN Trustee and the CN Trust beneficiaries shall treat the transfer of the CN Trust Assets to the CN Trust for the benefit of the CN Trust beneficiaries, whether their Claims are Allowed on or after the Effective Date, including any amounts or other assets subsequently transferred to the CN Trust (but only at such time as actually transferred) as (i) a transfer of the CN Trust Assets (subject to any obligations relating to such CN Trust Assets) directly to the CN Trust beneficiaries and, to the extent the CN Trust Assets are allocable to Disputed Claims that are the responsibility of the CN Trust to resolve, to the any Disputed Claims reserve established by the CN Trustee, followed by (ii) the transfer by the CN Trust beneficiaries to the CN Trust of the CN Trust Assets (other than the CN Trust Assets allocable to any the Disputed Claims reserve) in exchange for CN Trust Interests. Accordingly, the CN Trust beneficiaries shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the CN Trust Assets (other than such CN Trust Assets as are allocable to any Disputed Claims reserve). The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

Subject to contrary definitive guidance from the Internal Revenue Service or a court of competent jurisdiction (including the receipt by the CN Trustee of a private letter ruling if the CN Trustee so requests, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the CN Trustee), the CN Trustee may (1) timely elect to treat any Disputed Claims reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 and (2) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. The CN Trust, the CN Trustee, and the CN Trust beneficiaries shall report for U.S. federal, state and local income tax purposes consistently with the foregoing.

The CN Trust Advisory Board in the exercise of its business judgment may elect to withhold proceeds from the prosecution or settlement of Avoidance Actions to pay reasonable projected costs and expenses of the CN Trust.

The CN Trustee may deduct and withhold and pay to the appropriate taxing authority all amounts required to be deducted or withheld pursuant to the Tax Code or any provision of any state, local or non-U.S. tax law with respect to any payment or distribution to the CN Trust beneficiaries. Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any taxes imposed on such holder by any governmental authority, including income, withholding and other tax obligations, on account of such distribution. All such amounts withheld and paid to the appropriate taxing authority shall be treated as amounts distributed to such CN Trust beneficiaries for all purposes of this Agreement. The CN Trustee shall be authorized to collect such tax information from the CN Trust beneficiaries (including social security numbers or other tax identification numbers) as it, in its sole discretion, deems necessary to effectuate the Plan, the Confirmation Order and the CN Trust Agreement. As a condition to receive distributions under the Plan, all CN Trust beneficiaries will need to identify themselves to the CN Trustee and provide tax information and the specifics of their holdings, to the extent the CN Trustee deems appropriate, including an IRS Form W-9 or, in the case of CN Trust beneficiaries that are not United States persons for federal income tax purposes,

27

certification of foreign status on an applicable IRS Form W-8. This identification requirement may, in certain cases, extend to holders who hold their securities in street name. The CN Trustee may refuse to make a distribution to any CN Trust beneficiary that fails to furnish such information in a timely fashion, until such information is delivered; provided, however, that, upon the delivery of such information by a CN Trust beneficiary, the CN Trustee shall make such distribution to which the CN Trust beneficiary is entitled, without interest; and, provided, further, that, if the CN Trustee fails to withhold in respect of amounts received or distributable with respect to any such holder and the CN Trustee is later held liable for the amount of such withholding, such holder shall reimburse the CN Trustee for such liability. If the holder fails to comply with such a request for tax information within 180 days, the CN Trustee shall file a document with the Bankruptcy Court that will provide twenty-one (21) days' notice before such distribution shall be deemed an unclaimed distribution and treated in accordance with Article VII.

The CN Trustee and the CN Trust shall be discharged or dissolved, as the case may be, at such time as (1) the CN Trustee determines that the pursuit of additional Avoidance Actions is not likely to yield sufficient additional proceeds to justify further pursuit of such claims and (2) all distributions of CN Trust Assets required to be made by the CN Trustee have been made, but in no event shall the CN Trust be dissolved later than five years from the Effective Date unless the Bankruptcy Court, upon motion made within the six-month period before such fifth anniversary (and, in the event of further extension, at least six months before the end of the preceding extension), determines that a fixed period extension (not to exceed two (2) years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the CN Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the CN Trust Assets. Upon dissolution of the CN Trust, the CN Trustee shall turn over to the Debtors any then existing CN Trust Assets and all information necessary to make distributions to Class 6 Unsecured Creditors and the Debtors shall make any remaining distributions to Class 6 Unsecured Creditors

The CN Trustee shall file tax returns for the CN Trust treating the CN Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). The CN Trustee also will annually send to each CN Trust beneficiary a separate statement setting forth such holder's share of items of income, gain, loss, deduction or credit (including the receipts and expenditures of the CN Trust) as relevant for U.S. federal income tax purposes and will instruct all such CN Trust beneficiaries to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such CN Trust beneficiary's underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns. The CN Trustee shall also file (or cause to be filed) any other statement, return or disclosure relating to the CN Trust that is required by any Governmental Unit. The CN Trustee shall be responsible for payment, out of the CN Trust Assets, of any taxes imposed on the CN Trust or the CN Trust Assets, including any Disputed Claims reserve. In the event, and to the extent, any Cash retained on account of Disputed Claims in any disputed Claims reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims, such taxes shall be (i) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims or (ii) to the extent such Disputed Claims have subsequently been resolved, deducted from any amounts otherwise distributable by the CN Trustee as a result of the resolution of such Disputed Claims. The CN Trustee may request an expedited determination of taxes of the CN Trust, including

28

any Disputed Claims reserve, under Bankruptcy Code section 505(b), for all tax returns filed for, or on behalf of, the CN Trust for all taxable periods through the dissolution of the CN Trust.

F.    *Potential Avoidance Actions and Other Causes of Action*

On August 15, 2019, the Court entered an order authorizing the Committee to investigate, prosecute, settle, and otherwise administer litigation on behalf of Debtors' Estates concerning (a) claims that may be brought under Chapter 5 of the Bankruptcy Code, i.e., Avoidance Actions, and (b) claims against Debtors' insiders.  On October 27, 2019, the Committee communicated to the Debtors that:

(A) The Committee has undertaken a preliminary investigation concerning potential litigation claims the Debtors' Estates hold against third-parties, and that the claims investigated by the Committee fall into 3 categories: (a) avoidance actions related to Creditors who received payments on debts incurred within 90 days (1 year for insiders) of the Petition Date ("Preference Claims"), (b) certain barter transactions undertaken by the Debtors within the 90 days prior to the Petition Date ("Barter Claims"), and (c) claims against officers and directors of the Debtors for their breach of fiduciary duties ("D&O Claims").

(B) With respect to the Preference Claims and Barter Claims, the Committee believes that potential claims exist, but that they may be subject to defenses, including claims that the transactions were in the ordinary course of business or that new value was provided by the vendors after the preference payment.  Thus, the Committee cannot estimate the amount of a recovery.  The Committee's investigation included reviewing accounts payable ledgers of Debtors concerning their transactions with potential defendants, discussions with Debtors' management and the Debtors' counsel, and reviewing industry standard collection practices for debts.

(C) With respect to the D&O Claims, the Committee believes that a valid claim exists but, there is no insurance to make payment on such claims should they be successful, and the defendants would vigorously defend the claims.  Further, if the Plan is confirmed as presently stated, the D&O Claims would *not* be transferred to the CN Trust and would not be pursued at all.  The Committee's investigation of the D&O claims includes discussions with trade vendors, discussions with Debtors' management, and review of Debtors' books and records.

(D) Therefore, with respect to all the above described claims, no recovery can be guaranteed and litigation of them would likely take several years.

With respect to the Preference Claim and the Barter Claims, the Debtors state as follows: CNI estimates that it made payments to creditors of approximately $1.5 million in the ninety days prior to the Petition Date, CNM estimates that it made payments to creditors of approximately $750,000.00 in the ninety days prior to the Petition Date, and CNF estimates that it made payments to creditors of approximately $900,000.00 in the ninety days prior to the Petition Date.  In addition, there may have been a number of barter transactions that were completed within the ninety days prior to the Petition Date.  CNI, CNM and CNF have not done any analysis regarding how much of such transfers are recoverable as preferences under Chapter 5 of the Bankruptcy Code.  However, as a general matter, they believe that many or most of the transfers made within ninety days of the Petition Date will be subject to defenses, primarily the ordinary course and new value defenses, so that they do not

29

believe that net recoveries on Preference Claims and Barter Claims will produce a substantial amount of money for distribution to Class 7, 8 and 9 Creditors. The Committee has not shared with the Debtors any results of any investigation it has performed with respect to such claims, so that the Debtors are not in a position to assess such investigation or the Committee's statement that it believes that potential claims exist.

With respect to the D&O Claims, the Debtors state as follows: The Committee has not shared with the Debtors the results of any investigation it has performed with respect to such claims. The Committee has never discussed with Debtors' management any claim of the Debtors' Estates based on any breach of fiduciary duty by the Debtors' officers and directors. The Committee has not informed the Debtors of what books and records it has reviewed that would support any such claim. The Committee has never communicated to the Debtors the officers or directors that it believes breached any fiduciary duty to the Debtors and has never informed the Debtors of the facts that it believes would support any such claimed breach of fiduciary duty. Debtors' counsel has reviewed whether the Debtors' Estates have any such claims for breach of fiduciary duty by, among other things, familiarizing itself with and interviewing the Debtors' management regarding the Debtors' pre- and post-petition businesses and operations, and has concluded that no such colorable claims exist on behalf of the Debtors' Estates.

## G. Treatment of Executory Contracts and Unexpired Leases.

The Debtors shall file and seek to have heard contemporaneously with the Confirmation Hearing a motion or motions seeking the Bankruptcy Court's approval to assume or reject any Executory Contracts and Unexpired Leases to which Debtors are parties.

The two principal Unexpired Leases the Debtors will seek to assume are with Richards Farms, an Affiliate of the Debtors. Commencing on March 1, 2014, Richards Farms leased for ten year terms: (a) approximately 280 acres of real property located in Westbrook and Clinton, Connecticut, to CNI for $20,000.00 per month and (b) approximately 201 acres of real property located in Queen Anne's County, Maryland, to CNI and CNM for $30,000.00 per month. CNI and CNM conduct the majority of their businesses on these properties, and CNI and CNM would not be able to continue in business if they were unable to continue to lease these properties. The Debtors believe that the rent payable on these leases is below market, and intend to assume these leases in connection with Confirmation of the Plan. As detailed in Exhibit C, CNI and CNM owe Richards Farms approximately $1,050,000.00 for pre- and post-petition rent, which will be paid after Confirmation of the Plan. The Debtors believe that assumption of the two Unexpired Leases with Richards Farms is an appropriate exercise of their business judgment. Both properties are necessary for the Debtors to conduct their businesses. While the Debtors have not had a formal valuation performed, they believe that $20,000.00 to lease 280 acres and $30,000.00 per month to lease 200 acres in very prosperous areas of Connecticut and Maryland are very favorable, below market rents, i.e., Richards Farms could make higher and better use of its properties, so that the Debtors benefit by leasing the land from Richards Farms.

The only other substantial Executory Contract of the Debtors is a service agreement with Container Centralen, Inc. ("CC Racks"), pursuant to which the Debtors lease racks from CC Racks in connection with the delivery of product to customers. CC Racks has asserted a prepetition default under the service agreement in the amount of approximately $1.4 million. The Debtors and CC

Racks are negotiating to put in place a new agreement, which the Debtors expect will be effectuated either by an assumption of the existing agreement as amended, with such amendment to provide that no cure payment will be paid, or a rejection of the existing agreement and entry into a new agreement. The Debtors do not intend to assume the CC Racks service agreement as is so that they will not be obligated to make a cure payment to CC Racks.

The Debtors do not have any other substantial Executory Contracts or Unexpired Leases that would create a more than de minimis cure obligation or Unsecured Claim on account of rejection damages. As detailed in the Debtors Schedules, the Debtors were relatively current on their Executory Contracts, and certain Executory Contracts have expired by their terms during the pendency of the Cases.

The Debtors need not seek to assume any Executory Contracts entered into since the Petition Date, and the Debtors intend to continue to perform under such Executory Contracts in the ordinary course of their businesses. In any event, any Executory Contracts entered into since the Petition Date are ordinary course in nature, and the amounts due under such contracts are reflected in the projection annexed hereto as Exhibit C.

### H.    Provisions Governing Distributions

The Plan provides:

Reorganized Debtors or, in the case of Class 7, 8 and 9 Unsecured Claims, the CN Trustee shall make all distributions required by the Plan.

Any payment of Cash made by Reorganized Debtors or the CN Trustee pursuant to the Plan may be made at the option of such party either by check drawn on a domestic bank or by wire transfer from a domestic bank.

Except as otherwise provided in the Plan, any distributions or transfers by or on behalf of the Debtors under the Plan, including, but not limited to, distributions to any holder of an Allowed Claim, shall be free and clear of any liens, claims, and encumbrances, and no other Entity shall have any interest — legal, beneficial, or otherwise — in assets transferred pursuant to the Plan.

Unless otherwise provided in the Plan, any distribution to be made by the Reorganized Debtors or the CN Trustee shall be made at the time provided in Article II or Article III of the Plan. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim shall be made at the address of such holder as set forth on the Schedules filed with the Bankruptcy Court or on the books and records of the Debtors or their agents. The holder must notify the Reorganized Debtors in writing of a change of address or, in the case of holders of transferred Claims only, by the filing of a proof of claim or statement pursuant to Bankruptcy Rule 3001(e) by such holder or transferee that contains an address for such holder different than the address of such holder as set forth in the Schedules. The Reorganized Debtors and the CN Trustee shall not be liable for any

distribution sent to the address of record of a holder in the absence of the written change thereof as provided in the Plan.

If any Claim holder's distribution is returned as undeliverable, no further distributions to such holder shall be made unless and until the holder notifies the Reorganized Debtors or the CN Trustee, as appropriate, in writing of such holder's then-current address, at which time all missed distributions shall, subject to the final sentence of this paragraph, be made as soon as is practicable to such holder, without interest. Checks issued by the Reorganized Debtors or the CN Trustee in respect of Allowed Claims shall be null and void if not negotiated within one hundred and eighty (180) days after the date of issuance thereof. After such date, all such distributions shall be deemed unclaimed property under Bankruptcy Code section 347(b) and shall become unencumbered Cash of the Reorganized Debtors or the CN Trust.

To the extent permitted under applicable law, the Reorganized Debtors or the CN Trustee may set off against or recoup from any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), the claims, rights and causes of action of any nature that one of the Debtors or the CN Trustee has asserted in writing against the holder of such Allowed Claim, including, without limitation, any rights under Bankruptcy Code section 502(d), and in the absence of a written objection by such holder of an Allowed Claim within thirty (30) days of the delivery of such a writing from such Debtor, it will be conclusively presumed that the requirements for disallowance of a Claim under Bankruptcy Code section 502(d) or setoff or recoupment under applicable law have been satisfied. Neither the failure to affect such a setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release by a Debtor or the CN Trustee of any such claims, rights and causes of action that such Debtor may possess against such holder.

Distributions to any holder of an Allowed Claim shall be applied first to the satisfaction of the principal portion (as determined for federal income tax purposes) of any such Claim and thereafter to the remaining portion of such Allowed Claim, if any.

In connection with the Plan and all instruments issued in connection therewith and distributed thereon, the Debtors or the CN Trustee, as applicable, shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit on account of such distribution, including withholding tax obligations in respect of in-kind (non-Cash) distributions.

Unless otherwise specifically provided for in an order of the Bankruptcy Court, the Plan, or the Confirmation Order, or required by applicable bankruptcy law, post-petition interest shall not be paid on any Claims and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any such Claim for purposes of distributions under the Plan.

Notwithstanding any other provision in the Plan, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on any portion of that Claim unless and until and only to the extent such Claim becomes Allowed. To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of

such Allowed Claim in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Debtors or the CN Trustee, as applicable, shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required under applicable bankruptcy law.  On the Effective Date, the Debtors and the CN Trustee, as applicable, may establish one or more reserves for any such Claims that have not yet been Allowed.

I.      *Procedures For Resolving Contingent, Unliquidated and Disputed Claims*

The Plan provides:

After the Effective Date, the Reorganized Debtors and, in the case of Class 7, 8 and 9 Unsecured Claims, the CN Trustee, shall have and retain any and all rights and defenses the Debtors had with respect to any Claim or Equity Interest immediately prior to the Effective Date, except with respect to any Claim deemed Allowed under the Plan.  Except as expressly provided in the Plan or in any order entered in the Cases prior to the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order (including the Confirmation Order) in the Cases allowing such Claim.  All settled Claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court pursuant to Bankruptcy Rule 9019 or otherwise shall be binding on all parties.

Reorganized Debtors or, in the case of Class 7, 8 and 9 Unsecured Claims, the CN Trustee shall have the right to make, file and prosecute objections to Claims.  A copy of each objection shall be served upon the holder of the Claim to which the objection is made as soon as practicable (unless such Claim was already the subject of a valid objection by the Debtors), but in no event shall the service of such an objection be later than one (1) year after the Effective Date, unless such date is extended by order of the Bankruptcy Court.  All objections shall be litigated to a Final Order except to the extent such objection is withdrawn, or such objection is compromised, settled or otherwise resolved.

The Debtors or, in the case of Class 7, 8 and 9 Unsecured Claims, the CN Trustee may, at any time, request the Bankruptcy Court to estimate any Claim pursuant to Bankruptcy Code section 502(c) for any reason, regardless of whether the Debtors or any other party previously objected to such Claim, and the Bankruptcy Court will retain jurisdiction to estimate any Claim, at any time, including during litigation concerning any objection to such Claim.  In the event the Bankruptcy Court estimates any Disputed Claim, that estimated amount may constitute either the Allowed amount of such Claim or a maximum limitation on the Allowed amount of such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the Allowed amount of such Claim, a Debtor may elect to pursue any supplemental proceedings to object to any ultimate payment of such Claim.  All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.

Any Claim or Equity Interest that has been paid or satisfied, or any Claim or Equity Interest that has been amended or superseded, cancelled or otherwise expunged (including pursuant to the Plan), may be adjusted or expunged (including on the claims register, to the extent applicable) by the

33

Reorganized Debtors or CN Trustee, as applicable, without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

Any Claims held by Entities from which property is recoverable under Bankruptcy Code section 542, 543, 550 or 553 or that is a transferee of a transfer avoidable under Bankruptcy Code section 544, 545, 547, 548 or 549, shall be deemed disallowed pursuant to Bankruptcy Code section 502(d), and holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Reorganized Debtors or CN Trustee, as applicable.  Except as provided in the Plan, in an order of the Bankruptcy Court or otherwise agreed, any and all proofs of Claim filed after the Claims Bar Date shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order or approval of the Bankruptcy Court, and holders of such Claims may not receive any distributions on account of such Claims, unless at or prior to the Confirmation Hearing such late Claim has been deemed timely filed by a Final Order.

On or after the Effective Date, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court, the Reorganized Debtors or, in the case of Class 8, 9 and 10 Unsecured Claims, the CN Trustee.  Absent such authorization, any new or amended Claim Filed shall be deemed disallowed in full and expunged without any further action.

In no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed one hundred percent (100%) of the underlying Allowed Claim plus applicable interest, if any.

*J.      Conditions to Consummation of Plan*

The Plan provides that it shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied or occur in conjunction with the occurrence of the Effective Date: 1. the Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably acceptable to the Debtors; 2. all actions, documents, certificates and agreements necessary to implement the Plan have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable laws; 3. all governmental and third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions provided for in the Plan have been obtained, are not subject to unfulfilled conditions, and are in full force and effect, and all applicable waiting periods have expired without any action having been taken by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions; 4. all statutory fees and obligations then due and payable to the Office of the United States Trustee shall have been paid and satisfied in full; and 5. the CN Trust shall have been established.  The conditions to Consummation of the Plan set forth in the Plan, other than the condition that the Bankruptcy Court has entered the Confirmation Order, may be waived, in whole or in part, by the Debtors, in each case without further notice, leave, hearing or order of the Bankruptcy Court or any formal action and, thereupon, Consummation may occur, subject to the terms of the Bankruptcy Code and the Bankruptcy Rules.

*K.      Releases, Injunction and Related Provisions*

34

The Plan provides:

1.    <u>Discharge of Claims and Termination of Interests</u>

Pursuant to Bankruptcy Code section 1141(d), and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors) and Equity Interests of any nature whatsoever, including any interest accrued on Claims or Equity Interests from and after the Petition Date, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and Equity Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Equity Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability to the extent such Claims or Equity Interests relate to services performed by employees or other service providers of the Debtors prior to the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in Bankruptcy Code sections 502(g), 502(h), or 502(i), in each case whether or not: (a) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to Bankruptcy Code section 501; (b) a Claim or Equity Interest based upon such debt, right, or interest is allowed pursuant to Bankruptcy Code section 502; or (c) the holder of such a Claim or Equity Interest has accepted the Plan.  Any default or "event of default" by the Debtors with respect to any Claim or Equity Interest that existed immediately before or on account of the Filing of the Cases shall be deemed cured (and no longer continuing) as of the Effective Date with respect to a Claim that is unimpaired by the Plan.  Subject to the terms and conditions of the Plan, the Confirmation Order shall be a judicial determination of the discharge of all Claims and Equity Interests subject to the occurrence of the Effective Date.

2.    <u>Debtor Release</u>

**EFFECTIVE AS OF THE EFFECTIVE DATE, AND EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN, PURSUANT TO BANKRUPTCY CODE SECTION 1123(b), ON AND AFTER THE EFFECTIVE DATE, EACH RELEASED PARTY IS DEEMED RELEASED AND DISCHARGED BY THE DEBTORS, THE REORGANIZED DEBTORS AND THEIR ESTATES FROM ANY AND ALL CLAIMS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES AND LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISITNG OR HEREAFTER ARISING, IN LAW, EQUITY OR OTHERWISE, INCLUDING ANY DERIVATIVE CLAIMS, THAT THE DEBTORS, THE REORGANIZED DEBTORS OR THEIR ESTATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM AGAINST, OR EQUITY INTEREST IN, A DEBTOR, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART: (I) THE DEBTORS (INCLUDING THE MANAGEMENT, OWNERSHIP, OR OPERATION THEREOF), THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, INTERCOMPANY TRANSACTIONS, AND THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, ENTRY INTO,**

35

**OR FILING OF THE PLAN; (II) ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE DISCLOSURE STATEMENT OR THE PLAN; (III) THE CASES, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT; OR (IV) ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, OTHER THAN CLAIMS OR LIABILITIES ARISING OUT OF OR RELATING TO ANY ACT OR OMISSION OF A RELEASED PARTY THAT CONSTITUTES WILLFUL MISCONDUCT, GROSS NEGLIGENCE, OR A CRIMINAL ACT TO THE EXTENT SUCH ACT OR OMISSION IS DETERMINED BY A FINAL ORDER TO HAVE CONSTITUTED WILLFUL MISCONDUCT, GROSS NEGLIGENCE OR A CRIMINAL ACT.**

The Plan defines Released Parties as each of the Debtors' and the Debtors' Affiliates' respective current officers, directors, principals, members and employees. On August 15, 2019, the Court entered an order authorizing the Committee to investigate, prosecute, settle, and otherwise administer litigation on behalf of Debtors' Estates concerning, among other things, claims against the Debtors' insiders. On October 27, 2019, the Committee communicated to the Debtors that the Committee believes that a valid claim exists against directors and officers. The Committee recognizes that there is no insurance to make payment on such claims should they be successful. The Committee has not shared with the Debtors the results of any investigation it has performed with respect to such claims. The Committee has never discussed with Debtors' management any claim of the Debtors' Estates based on any breach of fiduciary duty by the Debtors' officers and directors and the Committee has not informed the Debtors of what books and records it has reviewed that would support any such claim. The Committee has never communicated to the Debtors the officers or directors that it believes breached any fiduciary duty to the Debtors and has never informed the Debtors of the facts that it believes would support any such claimed breach of fiduciary duty. Debtors' counsel has considered whether the Debtors' Estates have any such claims for breach of fiduciary duty by, among other things, familiarizing itself with and interviewing the Debtors' management regarding the Debtors' pre- and post-petition businesses and operations, and has concluded that no such colorable claims exist on behalf of the Debtors' Estates and that the Debtors' officers and directors conducted themselves in good faith and in the best interests of the Debtors. The Debtors believe that it is critical to the success of the Plan and the success of the Debtors business operations that the Debtors' officers and directors not be subjected to what the Debtors believe would be non-colorable claims that would distract the Debtors' officers and directors from operating the Debtors' businesses and potentially create significant expense for such officers and directors to defend themselves, expense that the Debtors may be obligated to indemnify such officers and directors for, *see* Connecticut General Statutes section 33-770 *et seq*.

3.   Exculpation

**EFFECTIVE AS OF THE EFFECTIVE DATE, TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW AND WITHOUT AFFECTING OR LIMITING THE DEBTOR RELEASE, AND EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN, NO EXCULPATED PARTY SHALL HAVE OR INCUR, AND**

**EACH EXCULPATED PARTY IS HEREBY RELEASED AND EXCULPATED FROM ANY CAUSE OF ACTION FOR ANY CLAIM RELATED TO ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF, THE CASES, THE DISCLOSURE STATEMENT, THE PLAN, OR ANY TRANSACTION, CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE DISCLOSURE STATEMENT OR THE PLAN, THE FILING OF THE CASES, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, EXCEPT FOR CLAIMS RELATED TO ANY ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED ACTUAL FRAUD, WILLFUL MISCONDUCT, GROSS NEGLIGENCE OR PROFESSIONAL MALPRACTICE, BUT IN ALL RESPECTS SUCH ENTITIES SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES PURSUANT TO THE PLAN. THE EXCULPATED PARTIES HAVE, AND UPON COMPLETION OF THE PLAN SHALL BE DEEMED TO HAVE, PARTICIPATED IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE LAWS WITH REGARD TO THE SOLICITATION OF, AND DISTRIBUTION OF, CONSIDERATION PURSUANT TO THE PLAN AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF SUCH DISTRIBUTIONS SHALL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING OR IN THE PLAN, OTHER THAN WITH RESPECT TO THE REORGANIZED DEBTORS THEMSELVES, THE EXCULPATION SET FORTH ABOVE SHALL NOT RELEASE OR BE AN EXCULPATION WITH RESPECT TO ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, ANY TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT EXECUTED TO IMPLEMENT THE PLAN.**

The Plan defines Exculpated Parties as the Debtors and their current directors, officers, shareholders, attorneys, financial advisors and accountants, the Committee and its members (solely in their representative capacity) and the Committee's attorneys. For the avoidance of doubt, under the Plan Exculpated Parties are limited to Estate fiduciaries who served during the pendency of the Cases, from the Petition Date through the Effective Date.

    4.    <u>Injunction</u>

**EFFECTIVE AS OF THE EFFECTIVE DATE, PURSUANT TO BANKRUPTCY CODE SECTION 524(A), TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, AND EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR FOR OBLIGATIONS ISSUED OR REQUIRED TO BE PAID PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES THAT HAVE HELD, HOLD, OR MAY HOLD CLAIMS OR EQUITY INTERESTS THAT HAVE BEEN RELEASED, DISCHARGED, OR ARE SUBJECT TO EXCULPATION ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM**

**TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTORS, THE REORGANIZED DEBTORS, THE EXCULPATED PARTIES, OR THE RELEASED PARTIES: (I) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR THE ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (IV) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS UNLESS SUCH ENTITY HAS TIMELY ASSERTED SUCH SETOFF RIGHT IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT EXPLICITLY PRESERVING SUCH SETOFF, AND NOTWITHSTANDING AN INDICATION OF A CLAIM OR INTEREST OR OTHERWISE THAT SUCH ENTITY ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO APPLICABLE LAW OR OTHERWISE; AND (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN.  NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING OR IN THE PLAN, THE INJUNCTION SET FORTH ABOVE SHALL NOT ENJOIN PURSUIT OF ANY CAUSES OF ACTION AS PROVIDED IN THE PLAN.**

L.    *Modification, Revocation or Withdrawal of the Plan*

The Plan provides:

Subject to the limitations contained in the Plan, the Debtors reserve the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in Bankruptcy Code section 1127 and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their right to alter, amend, or modify materially the Plan with respect to the Debtors, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan made prior to Confirmation are approved pursuant to Bankruptcy Code section 1127(a) and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan, or if Confirmation and Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Equity Interest or Class of Claims or Equity Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims or Equity Interests; (ii) prejudice in any manner the rights of the Debtors or any other Entity, including the holders of Claims or Equity Interests; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

M.    *Retention of Jurisdiction*

The Plan provides that the Bankruptcy Court shall retain such jurisdiction over the Cases and all Entities with respect to all matters related to the Cases, the Debtors and the Plan to the fullest extent legally permissible, including, without limitation, jurisdiction to: 1. allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Equity Interests; provided that, for the avoidance of doubt, the Bankruptcy Court's retention of jurisdiction with respect to such matters shall not preclude the Debtors or the Reorganized Debtors, as applicable, from seeking relief from any other court, tribunal, or other legal forum of competent jurisdiction with respect to such matters; 2. grant or deny any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date; 3. resolve any matters related to: (a) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which a Debtor is a party or with respect to which a Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, cure costs pursuant to Bankruptcy Code section 365, or any other matter related to such Executory Contract or Unexpired Lease; and (b) any dispute regarding whether a contract or lease is or was executory or expired; 4. adjudicate controversies, if any, with respect to distributions to holders of Allowed Claims; 5. hear, decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action that are pending as of the Effective Date or that may be commenced in the future, and grant or deny any applications involving the Debtors that may be pending on the Effective Date or instituted by the Reorganized Debtors after the Effective Date, <u>provided</u> that the Reorganized Debtors shall reserve the right to commence actions in all appropriate forums and jurisdictions; 6. resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan; 7. issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan, except as otherwise provided in the Plan; 8. resolve any cases, controversies, suits or disputes with respect to the release, exculpation, indemnification and other provisions contained in ARTICLE X of the Plan and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions; 9. enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed,

revoked, or vacated; 10. determine any other matters that may arise in connection with or related to the Plan, the Disclosure Statement, or the Confirmation Order; 11. hear and determine the Avoidance Actions; 12. consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order; 13. hear and determine matters concerning state, local, and federal taxes in accordance with Bankruptcy Code sections 346, 505, and 1146; 14. hear any other matter not inconsistent with the Bankruptcy Code and the jurisdiction of the Bankruptcy Court; and 15. enter an order concluding or closing the Cases.

N.    *Miscellaneous Provisions*

The Plan provides:

1.    Immediate Binding Effect

Subject to Article IX.A of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h) or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors or the Reorganized Debtors, as applicable, and any and all holders of Claims or Equity Interests (regardless of whether such Claims or Equity Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan and each Entity acquiring property under the Plan or the Confirmation Order and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any holder of a Claim or debt has voted on the Plan.

2.    Severability

If, prior to the Confirmation Date, any term or provision of the Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

3.    Additional Documents

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors and all holders of Claims or Equity Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan

4.      Entire Agreement

Except as otherwise described in the Plan, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan and the Confirmation Order.

5.      Successors and Assigns

The Plan shall be binding upon and inure to the benefit of the Debtors and their respective successors and assigns, including, without limitation, the Reorganized Debtors.  The rights, benefits, and obligations of any Person or Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person or Entity.

6.      Reservation of Rights

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order.  Neither the filing of the Plan, any statement or provision contained in the Plan, nor the taking of any action by the Debtors or any other Entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of the Debtors with respect to the holders of Claims or Equity Interests or other Entity prior to the Effective Date.

Neither the exclusion or inclusion by the Debtors of any contract or lease on any exhibit, schedule, or other annex to the Plan, nor anything contained in the Plan, will constitute an admission by the Debtors that any such contract or lease is or is not an Executory Contract or Unexpired Lease or that the Debtors or the Reorganized Debtors or their respective Affiliates has any liability thereunder.

Except as explicitly provided in the Plan, nothing in the Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, Avoidance Actions, or other rights of the Debtors or the Reorganized Debtors under any executory or non-executory contract or unexpired or expired lease.

Nothing in the Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors, as applicable, under any executory or non-executory contract or unexpired or expired lease.

7.      Controlling Document

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  The provisions of the Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each; provided, however, that if there is determined to be any inconsistency between any provision of the Plan and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of the Plan.

8.      Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated in the Plan, the laws of the State of Connecticut, without giving effect to the principles of conflict of laws that would require or permit the application of the law of another jurisdiction, shall govern the rights, obligations, construction, and implementation of the Plan, and any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); provided, that corporate governance matters relating to CNF shall be governed by the laws of the State of Florida.

9.      Computation of Time

Unless otherwise specifically stated in the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed in the Plan.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

10.     Dissolution of the Committee

On the Effective Date, the Committee shall dissolve automatically, provided, however, that following the Effective Date, the Committee shall continue to have standing and a right to be heard with respect to (i) Claims and/or applications for compensation by Professionals and (ii) any appeals of the Confirmation Order that remain pending as of the Effective Date to which the Committee is a party.  Upon dissolution of the Committee, all current and former members of the Committee and their respective officers, employees, counsel, advisors, and agents, shall be released and discharged of and from all further authority, duties, responsibilities, and obligations related to and arising from and in connection with the Cases, and the retention or employment of the Committee's attorneys, accountants, and other agents shall terminate, except as otherwise provided in the Plan.  The Reorganized Debtors shall not be responsible for paying any fees or expenses incurred by the members of the Committee or advisors to the Committee after the Effective Date, except for the limited purposes identified above.

11.     Closing of Cases

The Reorganized Debtors shall, promptly after the full administration of the Cases, file with the Bankruptcy Court all documents required under Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Cases.

O.      *Fee Dispute With The Office of the United States Trustee*

On April 17, 2019, the Debtors filed their Motion To Determine Amount Of United States Trustee Fees Pursuant To 28 U.S.C. § 1930(a)(6), Doc. No. 672, seeking an order that the Debtors US Trustee fee obligation should be paid at the lower pre-October 27, 2017 schedule.  The US Trustee objected to the Debtors' motion, and as part of the pre-trial order governing such motion the US Trustee agreed that US Trustee fees did not have to be paid pending resolution of the motion.

The Debtors' motion was denied by the Bankruptcy Court on August 28, 2019, and the Debtors timely filed an appeal of that denial. The US Trustee's position is that the Debtors owe $297,022.83 in US Trustee fees as of the end of the third quarter of 2019. Unless the Debtors have obtained a stay pending appeal, the Debtors shall be required to pay any outstanding US Trustee fees on the Effective Date. The Debtors believe that this will not impact the feasibility of the Plan. If the Debtors file a motion for a stay pending appeal, they will be required to demonstrate that, among other things, that they have a likelihood of success on their appeal and that they will be irreparably harmed if a stay is not granted.

### P.    Debtors' Post-Confirmation Management

The following are proposed to continue to serve, after Confirmation of the Plan, as officers and/or managing members of the Debtors:

CNI—
> David Richards—President
> Matthew Richards—Secretary
> Michael Richards—Treasurer
> Lori Holbrook—Chief Financial Officer

CNF—
> David Richards—President
> Matthew Richards—Treasurer
> Michael Richards—Secretary

CNM—
> David Richards—President
> Matthew Richards—Secretary
> Michael Richards—Treasurer

Triem—
> David Richards—Managing Member

The Debtors believe that the continuance in such offices of such individuals is consistent with the interests of Creditors and holders of Equity Interests and with public policy.

The following insiders will be retained as employees of the Debtors (salaries are paid by CNI): David Richards (salary = $410,384.00), Matthew Richards (salary = $182,000.00), and Michael Richards (salary = $49,400.44).

## IV.    CONFIRMATION OF THE PLAN

### A.    Confirmation Standards

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of Bankruptcy Code section 1129. The Debtors believe that the Plan satisfies or

will satisfy all of the statutory requirements of Chapter 11 of the Bankruptcy Code and that they have complied or will have complied with all of the requirements of Chapter 11 of the Bankruptcy Code. Specifically, the Debtors believe that the Plan satisfies or will satisfy the applicable confirmation requirements of Bankruptcy Code section 1129, including those set forth below.

• The Plan complies with the applicable provisions of the Bankruptcy Code.

• The Debtors, as the Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

• The Plan has been proposed in good faith and not by any means forbidden by law.

• Any payment made or to be made under the Plan for services or for costs and expenses in, or in connection with, the Cases, or in connection with the Plan and incident to the Cases, has been or will be disclosed to the Bankruptcy Court, and any such payment: (1) made before the Confirmation of the Plan is reasonable; or (2) is subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation of the Plan.

• With respect to each Class of Claims, each holder of an impaired Claim has accepted the Plan or will receive or retain under the Plan on account of such Claim property of a value as of the Effective Date of the Plan that is not less than the amount that such holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

• Each Class of Claims or Equity Interests that is entitled to vote on the Plan has either accepted the Plan or is not impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class of Claims pursuant to Bankruptcy Code 1129(b).

• Except to the extent that the holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that: (i) holders of Claims specified in sections 507(a)(2) will receive payment in full, in Cash; (ii) holders of Claims specified in Bankruptcy Code sections 507(a)(4), 507(a)(5), or 507(a)(7) will receive on account of such Claims payment in full, in Cash; and (iii) holders of Claims specified in Bankruptcy Code section 507(a)(8) will receive on account of such Claim payment in full, in Cash.

• At least one Class of impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any "insider," as that term is defined by Bankruptcy Code section 101(31), holding a Claim in that Class

• Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan, unless the Plan contemplates such liquidation or reorganization.

• The Debtors have paid or will pay on the Effective Date of the Plan all fees required under 28 U.S.C. § 1930.

1.    Best Interests of Creditors/Liquidation Analysis

Often called the "best interests" test, Bankruptcy Code section 1129(a)(7) requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as Exhibit B and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Debtors with the assistance of the Debtors' advisors. As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by holders of Claims or Equity Interests as compared to distributions contemplated under the Plan.  In a liquidation under Chapter 7 of the Bankruptcy Code, BOW's recovery would be diminished substantially, all other Creditors would receive little or nothing, and holders of Administrative Claims would not be paid in full.  Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to holders of Claims and Equity Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

2.    Financial Feasibility

Bankruptcy Code section 1129(a)(11) requires that the Bankruptcy Court find that confirmation is not likely to be followed by liquidation or the need for further financial reorganization, unless the plan contemplates such liquidation or reorganization.  For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan.  As part of this analysis, the Debtors have prepared certain financial projections, which projections and the assumptions upon which they are based are attached hereto as Exhibit C (the "Financial Projections").  Based on these Financial Projections, the Debtors believe the deleveraging contemplated by the Plan meets the financial feasibility requirement.  Moreover, the Debtors believe that sufficient funds will exist to make all payments required by the Plan. Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of Bankruptcy Code section 1129(a)(11).  The Debtors will present evidence at the Confirmation Hearing in support of the foregoing.

3.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or interests that is impaired under a plan accept the plan. A class that is not impaired under a plan is presumed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.  Pursuant to Bankruptcy Code section 1124, a class is impaired unless the plan either: (i) leaves unaltered the legal, equitable, and contractual rights to which the claim or the interest entitles the holder of such claim or interest; or (ii) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default—(A) cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in Bankruptcy Code section 365(b)(2) or of a kind that section 365(b)(2) expressly does not require to be cured; (B) reinstates the maturity of such claim or interest as such maturity existed before such default; (C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; (D) if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to Bankruptcy Code section 365(b)(1)(A), compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and (E) does not otherwise alter the legal, equitable, or contractual rights to which such claim or such interest entitles the holder of such claim or interest.

Bankruptcy Code Section 1126(c) defines acceptance of a plan by a class of impaired creditors as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject a plan.  Bankruptcy Code Section 1126(d) defines acceptance of a plan by a class of impaired interests as acceptance by holders of at least two-thirds in dollar amount of those interests who actually vote to accept or to reject a plan.

4.    Confirmation without Acceptance by All Impaired Classes

Bankruptcy Code section 1129(b) allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; provided that the plan has been accepted by at least one impaired class.  Pursuant to Bankruptcy Code Section 1129(b), notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.  If any impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of Bankruptcy Code Section 1129(b).  To the extent that any impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, under Bankruptcy Code Section 1129(b).

a.    No Unfair Discrimination

46

The test for unfair discrimination applies to classes of claims or interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent but that such treatment be "fair." In general, courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character). The Debtors do not believe the Plan discriminates unfairly against any impaired Class of Claims or Equity Interests. The Debtors believe that the Plan and the treatment of all Classes of Claims and Equity Interests satisfy the foregoing requirements for non-consensual Confirmation.

      b.    <u>Fair and Equitable Test</u>

The fair and equitable test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in such class. As to each non-accepting class, the test sets different standards depending on the type of claims or interests in such class. As set forth below, the Debtors believe that the Plan satisfies the "fair and equitable" requirement, notwithstanding the fact that certain Classes may reject the Plan.

      i.    <u>Secured Claims</u>

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims may be satisfied, among other things, if a debtor demonstrates that: (i) (x) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan, and (y) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens; or (ii) the holders of such secured claims realize the indubitable equivalent of such claims.

The Debtors believe that the treatment of any Secured Creditor who rejects the Plan is fair and equitable under the Plan, in that one of the tests set forth above is met.

      ii.    <u>Unsecured Claims</u>

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either: (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) the holder of any claim or any interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior interest in any property (the "Absolute Priority Rule").

If the Class 7, 8 and 9 do not accept the Plan (the requirements for acceptance of a plan are

described above), the Plan as currently structured cannot be confirmed as it will not meet the requirements of the Absolute Priority Rule.  As described herein, the Debtors believe that at this point the Plan is the only alternative available for the Debtors to reorganize, and that if the Debtors do not reorganize Unsecured Creditors will receive nothing and will be deprived of the opportunity to continue to do business with the Debtors.  Accordingly, the Debtors are confident that Classes 7, 8 and 9 will vote to accept the Plan.

    iii.    <u>Equity Interests</u>

The condition that a plan be "fair and equitable" to a non-accepting class of interests includes the requirements that either: (i) the plan provides that each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the effective date of the plan, equal to the greater of (x) the allowed amount of any fixed liquidation preference to which such holder is entitled, and (y) any fixed redemption price to which such holder is entitled; (ii) the value of such interest; or (iii) if the class does not receive the amount as required under clause (i) above, no class of interests junior to the non-accepting class may receive a distribution under the plan.

    c.    <u>Per Plan/Per Case Distinction</u>

There is a split of case authority on the issue of whether or not the confirmation standards under Bankruptcy Code section 1129 are applicable on a "per plan" or a "per case" basis.  To the extent that the Confirmation of the Plan relies on the per plan rule being applied, the Debtors believe that case law in the Second Circuit supports their position and is the better view of the law.

    5.    <u>The Debtor Releases, Third Party Releases, Exculpation, and Injunction Provisions</u>

Article X.B of the Plan provides for releases of claims and Causes of Action the Debtors may hold against the Released Parties. The Released Parties means each of the Debtors' and the Debtors' Affiliates' respective current and former officers, directors, principals, members, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

Article IX.C of the Plan provides for the exculpation of each Exculpated Party for certain acts or omissions taken in connection with the chapter 11 cases.  The Exculpated Parties are the Debtors and their current directors, officers, shareholders, attorneys, financial advisors and accountants, the Committee and its members (solely in their representative capacity) and the Committee's attorneys. The Plan provides that for the avoidance of doubt, Exculpated Parties are limited to Estate fiduciaries who served during the pendency of the Cases, from the Petition Date through the Effective Date.

It is well-settled that debtors are authorized to settle or release their claims in a chapter 11 plan.  Debtor releases are granted by courts in the Second Circuit where the Debtors establish that

such releases are in the "best interests of the estate." Courts often find that releases pursuant to a settlement are appropriate. Additionally, exculpation provisions that extend to post-petition conduct are regularly approved. In approving these provisions, courts consider a number of factors, including whether the beneficiaries of the exculpation have participated in good faith in negotiating the plan and bringing it to fruition, and whether the provision is integral to the plan.

The Debtors believe that the releases, exculpations, and injunctions set forth in the Plan are appropriate because, among other things, each of the Released Parties has afforded value to the Debtors and aided in the reorganization process, which facilitated the Debtors' ability to propose and pursue Confirmation of the Plan. The Debtors believe that each of the Released Parties has played an integral role in formulating the Plan and has expended significant time and resources analyzing and negotiating the issues presented by the Debtors' prepetition capital structure. The Debtors further believe that such releases, exculpations, and injunctions are a necessary part of the Plan. The Debtors will be prepared to meet their burden to establish the basis for the releases, exculpations, and injunctions for each Released Party and Exculpated Party as part of Confirmation of the Plan.

B.    *Alternatives to Confirmation*

    1.    <u>Liquidation Under Chapter 7</u>

If no plan can be Confirmed, the Debtors' Cases may be converted to cases under Chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and the Debtors' Liquidation Analysis is described in Exhibit B attached hereto.

    2.    <u>Filing of an Alternative Plan of Reorganization</u>

If the Plan is not confirmed, the Debtors or any other party in interest could attempt to formulate a different plan of reorganization, which might involve either a reorganization and continuation of the Debtors' businesses or an orderly liquidation of their assets. The Debtors have explored various alternatives to the Plan before the date hereof and believe that the Plan will enable the Debtors to emerge from Chapter 11 successfully and expeditiously, preserve their business and allow creditors to realize the highest recoveries under the circumstances. In a liquidation under Chapter 11 of the Bankruptcy Code, the assets of the Debtors would be sold in an orderly fashion over a more extended period of time than in a liquidation under Chapter 7, and a trustee need not be appointed. Although a Chapter 11 liquidation is preferable to a Chapter 7 liquidation, the Debtors believe that a liquidation under Chapter 11 is a much less attractive alternative to Creditors than the Plan because the Plan provides for a greater return to Creditors.

**V.    RISK FACTORS**

**PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD READ AND CAREFULLY CONSIDER THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT. ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE PLAN AND ITS IMPLEMENTATION.**

A.    *General*

The following provides a summary of various important considerations and risk factors associated with the Plan; however, it is not exhaustive.  In considering whether to vote to accept or reject the Plan, holders of Claims and Equity Interests should read and carefully consider the factors set forth below, as well as all other information set forth or otherwise referenced or incorporated by reference in this Disclosure Statement.

B.    *Certain Bankruptcy Law Considerations*

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to holders of Allowed Claims and Equity Interests under the Plan but will not necessarily affect the validity of the vote of the impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of holders of Claims and Equity Interests in such impaired Classes.

1.    <u>Parties in Interest May Object to the Plan's Classification of Claims and Equity Interests</u>

Bankruptcy Code section 1122 provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Equity Interests each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other Claims or Equity Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

2.    <u>The Conditions Precedent to the Consummation of the Plan May Not Occur</u>

As more fully set forth in Article VIII of the Plan, Consummation of the Plan is subject to a number of conditions precedent.  If such conditions precedent are not waived or not met, Consummation will not take place, and it is unclear what distributions, if any, holders of Allowed Claims or Equity Interests would receive with respect to their Allowed Claims or Equity Interests.

3.     The Debtors May Fail to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or transaction.  There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the holders of Equity Interests and Allowed Claims as those proposed in the Plan, and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to Creditors than the Plan.

4.     The Debtors May Not Be Able to Secure Confirmation of the Plan

Bankruptcy Code section 1129 sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met.

If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, holders of Equity Interests and Allowed Claims against them would ultimately receive.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications could result in less favorable treatment of any non-accepting Class of Claims or Equity Interests, as well as any Class junior to such non-accepting Class, than the treatment currently provided in the Plan.  Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

5.      Nonconsensual Confirmation

In the event that an impaired class of claims or equity interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under Bankruptcy Code section 1124) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class.  The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with Bankruptcy Code subsection 1129(b). Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

6.      Continued Risk Upon Confirmation

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further industry deterioration or other changes in economic conditions, and increasing expenses.  Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed.  As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

7.      Filing of a Competing Plan

At the outset of the Chapter 11 cases, the Bankruptcy Code provides debtors with the exclusive right to propose a plan and prohibits creditors and others from proposing a plan.  The Debtors have not retained the exclusive right to propose a plan in these Cases.  There could be a material adverse effect on the Debtors' ability to achieve Confirmation of the Plan in order to achieve the Debtors' stated goals because creditors and others may propose a plan.

8.      The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code

If a bankruptcy court finds that it would be in the best interest of creditors or the debtor in a Chapter 11 case, the bankruptcy court may convert a Chapter 11 bankruptcy case to a case under Chapter 7 of the Bankruptcy Code.  In such event, a Chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that liquidation under Chapter 7 would result in significantly smaller distributions being made to Creditors than those provided for in a Chapter 11 plan because

of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

9.      The Debtors or the CN Trustee May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors and the CN Trustee reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any holder of a Claim where such Claim is subject to an objection.  Any holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

10.      Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

11.      Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and all such contingencies, which could affect distributions available to holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the impaired Classes to accept or reject the Plan or require any sort of revote by the impaired Classes.

The estimated Claims and Creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to holders of Allowed Claims under the Plan.

12.      The Plan's Release, Injunction, and Exculpation Provisions May Not Be Approved

Article IX of the Plan of provides for certain releases, injunctions, and exculpations, including a release of liens and third party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations (including, for the avoidance of doubt, the definitions of Released Parties, Releasing Parties, and Exculpated Parties) provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain parties may not be considered Released Parties, Releasing Parties, or Exculpated Parties, and certain Released Parties may withdraw their support for the Plan.

13. The Total Amount of Allowed Unsecured Claims May Be Higher Than Anticipated By the Debtors

With respect to holders of Allowed Unsecured Claims, the Claims filed against the Debtors may be materially higher than the Debtors have estimated.

14. The Total Amount of Allowed Administrative and Priority Claims May Be Higher or the Amount of Distributable Cash may be Lower Than Anticipated By the Debtors

The amount of Cash the Debtors hold prior to and following the Effective Date may be lower than anticipated. Additionally, Allowed Administrative Claims and Allowed Priority Claims may be higher than anticipated. Accordingly, there is a risk that the Debtors will not be able to pay in full in Cash all Administrative Claims and Priority Claims on the Effective Date as is required to confirm a Chapter 11 plan of reorganization.

15. Certain Tax Implications of the Plan

Holders of Allowed Claims should carefully review Article XI of this Disclosure Statement, entitled "Certain U.S. Federal Income Tax Consequences of the Plan," to determine how the tax implications of the Plan and the Cases may adversely affect certain holders of Claims and Equity Interests.

C. *Risks Related to the Debtors' Businesses*

1. The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Cases

For the duration of the Chapter 11 cases, the Debtors' ability to operate will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following: (a) ability to develop, confirm, and consummate the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions filed in the Cases from time to time; (c) ability to maintain relationships with suppliers, vendors, service providers, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and

obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to propose and confirm a Chapter 11 plan, to appoint a Chapter 11 trustee, or to convert the Cases to Chapter 7 proceedings; and (g) the actions and decisions of the Debtors' Creditors and other third parties that may be inconsistent with the Debtors' plans.  These risks and uncertainties could affect the Debtors' businesses and operations in various ways.  For example, negative events associated with the Chapter 11 cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition and ability to Consummate the Plan.  Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities.  Because of the risks and uncertainties associated with the Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Cases that may be inconsistent with the Debtors' plans.

2.      The Debtors May Not Be Able to Achieve Their Projected Financial Results

The Debtors may not be able to meet their projected financial results or achieve the revenue or cash flow that the Debtors have assumed in projecting their future business prospects.  If the Debtors do not achieve these projected revenue or cash flow levels, the Debtors may lack sufficient liquidity to continue operating as planned after emergence.  The financial projections represent management's view based on currently known facts and hypothetical assumptions about their future operations.  They do not, however, guarantee the Debtors' future financial performance.

3.      Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses

A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity.  So long as the proceedings related to the Cases continue, the Debtors' management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations.  A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain key personnel necessary to the success of the Debtors' businesses.  In addition, the longer the proceedings related to the Chapter 11 cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships.  So long as the proceedings related to the Chapter 11 cases continue, the Debtors will be required to incur substantial costs for Professional Fees and other expenses associated with the administration of the Cases.

4.      The Debtors May be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases

55

The Debtors or, in the future the Reorganized Debtors, may become party to litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Debtors or Reorganized Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Debtors or Reorganized Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Debtors or Reorganized Debtors' businesses and financial stability, however, could be material.

5.    The Loss of Key Personnel Could Adversely Affect the Debtors' Operations

The Debtors' operations are dependent on a relatively small group of key employees. The Debtors' recent liquidity issues and the Cases have created distractions and uncertainty for such key employees. As a result, the Debtors have experienced a degree of employee attrition. The loss of such key personnel could adversely affect the Debtors' ability to operate their businesses. In addition, a loss of key personnel could have a material adverse effect on the Debtors' ability to meet customer and counterparty expectations, thereby adversely affecting the Debtors' businesses and the results of operations.

6.    Increases in Prices For Product and Supplies Could have a Material Effect on the Debtors' Businesses

The purchase of certain products and supplies represents a large portion of the Debtors' overall cost structure. Increases in the costs of these inputs may increase the Debtors' overall costs and the Debtors may not be able to maintain projected gross margins on the sale of products to their customers.

7.    The Debtors' Business is Subject to Laws and Regulations That Can Adversely Affect the Cost, Manner, or Feasibility of Doing Business

The Debtors' operations are subject to extensive laws and regulations, including complex environmental laws and occupational health and safety laws. The Debtors may be required to make large expenditures to comply with such regulations. Failure to comply with these laws and regulations may result in the suspension or termination of operations and subject the Debtors to administrative and/or civil penalties.

## VI.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

*A.    Introduction*

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors (as defined below) and certain U.S. Holders (as defined below) of Claims. Except as provided below, this summary does not address the U.S. federal income

56

tax consequences to holders of Claims not entitled to vote to accept or reject the Plan.  This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions, and published administrative rules, rulings, and pronouncements of the U.S. Internal Revenue Service (the "IRS") all as in effect on the date hereof.  Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties.  The Debtors have not requested and will not request a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan.  Thus, no assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion addresses only those U.S. Holders that hold Claims as capital assets within the meaning of Section 1221 of the Tax Code.  In addition, this summary does not address non-U.S., state, local, estate, or gift tax consequences of the Plan, nor does it purport to address the U.S. federal income tax consequences of the Plan to special classes of taxpayers (such as persons who are related to a Debtor within the meaning of the Tax Code, persons that are not U.S. Holders, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, real estate investment trusts, retirement plans, individual retirement and other tax-deferred accounts, persons whose functional currency is not the U.S. dollar, persons subject to the alternative minimum tax or the "Medicare" tax on unearned income, tax exempt organizations, investors in pass-through entities, subchapter S corporations, persons who hold Claims, or who will hold Equity Interests in the Reorganized Debtors, as part of a straddle, hedge, constructive sale, conversion transaction, or other integrated investment, persons using a mark to market method of accounting, and U.S. Holders of Claims who are themselves in bankruptcy).  Furthermore, this discussion assumes that U.S. Holders of Claims hold only Claims in a single Class.  U.S. Holders of Claims in more than a single Class should consult their own tax advisors as to the effect such ownership may have on the U.S. federal income tax consequences described below.  This discussion also assumes that the various debt and other arrangements to which the Debtors are parties will be respected for U.S. federal income tax purposes in accordance with their form.

For purposes of this discussion, the term "U.S. Holder" means a holder of a Claim that is for U.S. federal income tax purposes (i) an individual citizen or resident of the United States, (ii) a corporation, or entity treated as a corporation, organized in or under the laws of the United States or any state thereof or the District of Columbia, (iii) a trust if (a) a court within the United States is able to exercise primary supervision over the administration of the trust and one or more U.S. persons have the authority to control all substantial decisions of the trust or (b) such trust has made a valid election to be treated as a U.S. person for U.S. federal income tax purposes or (iv) an estate, the income of which is includible in gross income for U.S. federal income tax purposes regardless of its source.

If a partnership (or other Entity treated as a partnership or other pass-through Entity for U.S. federal income tax purposes) is a holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the

activities of the Entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are holders of Claims should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

This summary is not intended to constitute a complete analysis of all tax considerations relevant to a particular U.S. Holder. Each U.S. Holder should seek advice from its own independent tax advisors concerning the U.S. federal, state, local, foreign income, and other tax consequences of the Plan to it in light of its particular circumstances. ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE PARTICULAR CIRCUMSTANCES PERTAINING TO A HOLDER OF AN ALLOWED CLAIM OR ALLOWED EQUITY INTEREST. ALL HOLDERS OF ALLOWED CLAIMS AND ALLOWED EQUITY INTRERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE U.S. FEDERAL, STATE, LOCAL, AND NON-UNITED STATES TAX CONSEQUENCES OF THE PLAN.

B.     *Certain U.S. Federal Income Tax Consequences to the Debtor*

   1.     <u>Transfer of CN Trust Assets To CN Trust</u>

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Debtors believe the CN Trust should be treated as a "liquidation trust" for U.S. federal income tax purposes pursuant to Treasury Regulation section 301.7701-4(d), and that the CN Trustee will take a position on the CN Trust's tax return accordingly. For U.S. federal income tax purposes, the transfer of assets to the CN Trust will be deemed to occur as (a) a first-step transfer of the CN Trust Assets to the holders of Class 6 Unsecured Claims and (b) a second-step transfer by such holders to the CN Trust of such portion of the CN Trust Assets in exchange for the CN Trust Equity Interests.

No request for a ruling from the IRS will be sought on the classification of the CN Trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the CN Trust. If the IRS were to challenge successfully the classification of the CN Trust as a grantor trust, the federal income tax consequences to the CN Trust and the CN Trust beneficiaries could vary from those discussed in the Plan (including the potential for an entity-level tax). For example, the IRS could characterize the CN Trust as a so-called "complex trust" subject to a separate entity-level tax on its earnings, except to the extent that such earnings are distributed during the taxable year.

As soon as possible after the transfer of the CN Trust Assets to the CN Trust, the CN Trustee shall make a good faith valuation of the CN Trust Assets. This valuation will be made available from time to time, as relevant for tax reporting purposes. Each of the Debtors, the CN Trustee, and the holders of Claims receiving Equity Interests in the CN Trust shall take consistent positions with respect to the valuation of the CN Trust Assets, and such valuations shall be utilized for all U.S. federal income tax purposes.

Allocations of taxable income of the CN Trust among the CN Trust beneficiaries shall be

determined by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the CN Trust had distributed all its assets (valued at their tax book value) to the CN Trust beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the CN Trust. Similarly, taxable loss of the CN Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining CN Trust Assets. The tax book value of the CN Trust Assets shall equal their fair market value on the date of the transfer of the CN Trust Assets to the CN Trust, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

The CN Trust shall in no event be dissolved later than five (5) years from the creation of such CN Trust unless the Bankruptcy Court, upon motion within the six (6) month period prior to the fifth (5th) anniversary (or within the six (6) month period prior to the end of an extension period), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the CN Trustee that any further extension would not adversely affect the status of the trust as a liquidating trust for United States federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the CN Trust Assets.

The CN Trust will file annual information tax returns with the IRS as a grantor trust pursuant to Treasury Regulations section 1.671-4(a) that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the CN Trust Assets (e.g., income, gain, loss, deduction and credit). Each CN Trust beneficiary holding a beneficial interest in the CN Trust will receive a copy of the information returns and must report on its federal income tax return its share of all such items. The information provided by the CN Trust will pertain to CN Trust beneficiaries who received their Equity Interests in the CN Trust in connection with the Plan.

Subject to contrary definitive guidance from the IRS or a court of competent jurisdiction (including the receipt by the CN Trustee of an IRS private letter ruling if the CN Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the CN Trustee), the CN Trustee may (A) elect to treat any Disputed Claims reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 and (B) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. Accordingly, any Disputed Claims reserve may be subject to tax annually on a separate entity basis on any net income earned with respect to the CN Trust Assets in such reserve, and all distributions from such reserve (which distributions will be net of the related expenses of the reserve) will be treated as received by holders in respect of their Claims or Equity Interests as if distributed by the Debtors. All parties (including, without limitation, the Debtors, the CN Trustee and the CN Trust beneficiaries) will be required to report for tax purposes consistently with the foregoing.

Because certain assets being transferred to the CN Trust by the Debtors include assets with no tax basis, the Debtors may recognize taxable income in connection with such transfers to the extent of the value of such assets.

    2.    <u>Cancellation of Debt and Reduction of Tax Attributes of the Debtors</u>

In general, absent an exception, the U.S. Debtor will realize and recognize cancellation of debt income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of Cash paid, (ii) the issue price of any new indebtedness of the taxpayer issued, and (iii) the fair market value of any other new consideration (including stock of the debtor) given in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the Tax Code, however, a debtor is not required to include COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding.  Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to the rule discussed in the preceding sentence.  In general, tax attributes will be reduced in the following order: (a) NOLs and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets; (f) passive activity loss and credit carryovers; and (g) foreign tax credit carryovers.  Alternatively, a debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code.  The reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined.  Any excess COD Income over the amount of available tax attributes is not subject to U.S. federal income tax and has no other U.S. federal income tax impact.

The amount of COD Income of the Debtors, and accordingly the amount of tax attributes of the Debtors required to be reduced, cannot be known with certainty at this time.  However, as a result of Confirmation, the Debtors expects that there will be material reductions in, or elimination of, NOLs, NOL carryforwards and other tax attributes that are not utilized before the end of the tax year in which the Effective Date occurs.

C.      *Certain U.S. Federal Income Tax Consequences to U.S. Holders of Unsecured Claims*

Holders of Unsecured Claims are urged to consult their tax advisors regarding the tax consequences of the Plan.

Pursuant to the Plan, in exchange for full and final satisfaction, settlement, release, and discharge of their Unsecured Claims, the holders of such Claims shall receive their Pro Rata share of the CN Trust Assets net of costs related to the CN Trust.  As discussed above, the Debtors expect (and the CN Trust documents shall provide) that the CN Trustee will treat the CN Trust as a grantor trust of which the holders of Unsecured Claims are the grantors.  Each holder of an Unsecured Claim should accordingly be treated as having (a) received its Pro Rata share of the CN Trust Assets from the Debtors and (b) contributed such assets to the CN Trust in exchange for the CN Trust Equity Interests.

A U.S. Holder's receipt of the CN Trust Equity Interests should be treated as a taxable exchange under section 1001 of the Tax Code.  Other than with respect to any amounts received that are attributable to accrued but untaxed interest (or original issue discount), each U.S. Holder of such Claim should recognize gain or loss equal to the difference between: (i) the sum of (A) the amount

60

of any Cash received plus (B) the fair market value of the CN Trust Assets deemed received; and (ii) such U.S. Holder's adjusted basis, if any, in such Claim.

U.S. Holders of such Claims should obtain a tax basis in their Pro Rata share of each of the CN Trust Assets equal to the fair market value of such holder's Pro Rata share of each CN Trust Assets as of the date such property is treated as having been distributed to the U.S. Holder pursuant to (a) above. The holding period for the beneficial interest in these assets should begin on the day following the Effective Date.

The U.S. federal income tax obligations of holders with respect to their beneficial interest in the CN Trust are not dependent on the CN Trust distributing any Cash or other proceeds. Holders of such Claims will be required to report on their U.S. federal income tax returns their share of the CN Trust's items of income, gain, loss, deduction, and credit in the year recognized by the CN Trust. This requirement may result in such Holders being subject to tax on their allocable share of the CN Trust's taxable income prior to receiving any cash distributions from the CN Trust. In general, except with respect to the Disputed Claims reserve, a distribution of Cash by the CN Trust will not be separately taxable to a holder of a beneficial interest in the CN Trust since the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed at the time the Cash was earned or received by the CN Trust).

**HOLDERS OF ALLOWED UNSECURED CLAIMS ARE URGED TO CONSULT THEIR TAX ADVISORS REGARDING THE TAX CONSEQUENCES OF THE RIGHT TO RECEIVE AND OF THE RECEIPT (IF ANY) OF PROPERTY FROM THE CN TRUST. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR CLAIMS.**

D.     *Accrued Interest*

To the extent that any amount received by a U.S. Holder of a Claim is attributable to accrued but unpaid interest that accrued during its holding period, such amount should be taxable to the U.S. Holder as interest income (to the extent not already taken into income by the Holder). Conversely, a U.S. Holder of a Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest on the Claim was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which the consideration received by the U.S. Holder of a Claim will be attributable to accrued interest is unclear. The Plan generally provides that distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest. Nevertheless, the Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal. The applicability of these Treasury Regulations to a partial recovery in a bankruptcy is unclear. A U.S. Holder of a Claim with accrued and unpaid interest is urged to consult its own tax advisor as to the allocation of any recovery between principal and interest.

*E.*     *Market Discount*

Under the "market discount" provisions of sections 1276 through 1278 of the Tax Code, some or all of the gain realized by a U.S. Holder of a Claim on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "accrued market discount" on the Claim. In general, a debt instrument is considered to have been acquired with "market discount" if its holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (ii) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a de minimis amount (equal to 0.25 percent of the sum of all remaining payments to be made on the Claim, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of a Claim that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).

*F.*     *Information Reporting and Backup Withholding*

Payments with respect to Claims and Equity Interests under the Plan may be subject to applicable information reporting and backup withholding (at the applicable rate). Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a U.S. Holder's federal income tax liability, and a U.S. Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate timely claim for refund with the IRS (generally, a federal income tax return). Furthermore, certain penalties may be imposed by the IRS on a recipient of payments who is required to supply information but who does not do so in the proper manner.

Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of certain thresholds. Holders of Claims are urged to consult their own tax advisors regarding these regulations and whether the contemplated transactions under the Plan would be subject to these regulations and require disclosure on their tax returns.

The U.S. federal income tax consequences of the Plan are complex. The foregoing summary does not discuss all aspects of U.S. federal income taxation that may be relevant to a particular U.S. Holder in light of such U.S. Holder's circumstances and income tax situation. All holders of Claims should consult with their tax advisors as to the particular tax consequences to them of the transactions contemplated by the Plan, including the applicability and effect of any state, local, or foreign tax laws and of any change in applicable tax laws.

**VII.    CONCLUSION AND RECOMMENDATION**

The Debtors believe, for the reasons described herein and in the Plan, that the Plan offers

Creditors the most favorable alternative under existing circumstances because it will provide the greatest recoveries to Creditors.   Alternatives would involve significant delay, uncertainty and substantial additional administrative costs.   **ACCORDINGLY, THE DEBTORS URGE ALL CREDITORS WHO ARE ENTITLED TO VOTE ON THE PLAN TO ACCEPT THE PLAN AND TO EVIDENCE SUCH ACCEPTANCE BY RETURNING THEIR BALLOTS SO THEY WILL BE RECEIVED NO LATER THAN 4:00 P.M., PREVAILING EASTERN TIME, ON _____ __, 2019.**

Dated: October 28, 2019

THE DEBTORS,

CLINTON NURSERIES, INC.,CLINTON NURSERIES OF
MARYLAND, INC., CLINTON NURSERIES OF FLORIDA,
INC., and TRIEM LLC


By: ____/s/_____
Eric Henzy (ct12849)
ZEISLER & ZEISLER, P.C.
10 Middle Street, 15th Floor
Bridgeport, CT  06605
Tel. 203-368-4234
Fax 203-367-9678
Email: ehenzy@zeislaw.com
Their Attorneys